**PUBLIC UTILITY COMMISSION OF TEXAS and Office of Public Utility Counsel, Petitioners,**

v.

**GULF STATES UTILITIES COMPANY, Respondent.**

No. C–9731.

Supreme Court of Texas.

April 3, 1991.

Rehearing Overruled June 19, 1991.

Dan Morales, Susan D. Bergen, C. Kingsbery Ottmers and John L. Laakso, Austin, for petitioners.

Barry Bishop, John F. Williams, Austin, for respondent.

## OPINION

PHILLIPS, Chief Justice.

This case is an administrative appeal from a final order of the Texas Public Utility Commission. Gulf States Utilities Company (GSU) sought the Commission's approval of the sale of two of GSU's generating units and of GSU's proposed rate treatment of certain revenues and expenses associated with that transaction. GSU proposed to sell the two plants to a joint venture comprised of GSU and three of its Louisiana industrial customers; GSU then planned to purchase the entire electrical output from the plants for distribution to its customers. GSU requested the Commission to rule that, in future rate proceedings, it be allowed to recover from its ratepayers its total purchase price for the electricity and furthermore that it be allowed to allocate the proceeds from the sale of the depreciated plants to its shareholders rather than to its ratepayers.

The Commission concluded that the proposed sale was generally in the public interest but imposed two conditions on GSU's treatment of the transaction in future rate proceedings. First, the Commission determined that it was not in the public interest for GSU's ratepayers "to pay in excess of GSU's avoided cost" for power purchased from the joint venture. Therefore, the Commission held that it would not allow GSU to recover from its Texas ratepayers payments for electricity from the joint venture in excess of GSU's avoided cost. Second, the Commission determined that GSU must divide the proceeds from the sale of the plants between the ratepayers and its shareholders in proportion to the amount each group contributed to the cost of the plants.

The district court affirmed the Commission's order. The court of appeals then reversed the judgment of the district court and remanded the case to the Commission. 784 S.W.2d 519. The Commission and the Office of Public Utility Counsel now appeal to this court. We must first determine whether the applicable state and federal regulations permit a utility purchasing power from a cogenerator to recover from its ratepayers payments in excess of its avoided cost. Second, we must determine whether the Commission's allocation of the utility's proceeds from the sale of its plants was proper. For the reasons that follow, we affirm the judgment of the court of appeals.

I

A

In 1978, in response to rising energy costs and recent fuel shortages, Congress sought ways to conserve energy to reduce

the nation's dependence on foreign oil and on natural gas. *See Federal Energy Regulatory Comm'n v. Mississippi*, 456 U.S. 742, 745–46, 102 S.Ct. 2126, 2130, 72 L.Ed.2d 532, 538 (1982). One possible remedy was to increase the use of cogeneration. Cogeneration involves the simultaneous production of electrical power and thermal energy, such as heat or steam, usually at an industrial site. *Id.* at 750 & n. 11, 102 S.Ct. at 2132 & n. 11, 72 L.Ed.2d at 541 & n. 11. By making productive use of the "waste" heat produced in the generation of electricity, cogeneration can reduce fuel consumption by as much as one half. *See* C. PHILLIPS, THE REGULATION OF PUBLIC UTILITIES: THEORY AND PRACTICE 452 n. 92 (1988); *see also* 45 Fed.Reg. 12,215 (1980).

To encourage cogeneration, Congress enacted section 210 of the Public Utility Regulatory Policies Act of 1978 (PURPA). Pub.L. No. 95–617, 92 Stat. 3117 (1978) (codified as amended at 16 U.S.C. § 824a–3 (1988)). An obstacle to the development of cogeneration facilities in the past had been the reluctance of the traditional utilities to purchase excess power from, or sell backup power to, these nontraditional facilities. *FERC v. Mississippi*, 456 U.S. at 750–51, 102 S.Ct. at 2132–33, 72 L.Ed.2d at 541. Section 210 of PURPA attempts to remove this obstacle by *requiring* that electric utilities purchase electrical energy from qualifying cogenerating or small power production facilities [1] (QFs) and provide back-up power to QFs on a nondiscriminatory basis.[2]

In section 210, Congress directed the Federal Energy Regulatory Commission (FERC) to prescribe, within one year of the statute's enactment, rules requiring electric utilities to purchase power from and sell power to QFs. PURPA § 210(a), 16 U.S.C. § 824–3(a) (1988). Congress further provided that the rates established by FERC for the purchases of electricity by a utility (1) shall be just and reasonable to the utility's customers, and (2) shall not discriminate against QFs. PURPA § 210(b), 16 U.S.C. § 824–3(b) (1988). Section 210(b) also provides that "[n]o ... rule prescribed under subsection (a) of this section shall provide for a rate which exceeds the incremental cost to the electric utility of alternative electric energy." *Id.* The "incremental cost of alternative electric energy" is defined as the cost the utility would have incurred if it had generated itself or purchased from another utility the same amount of power it purchased from the QF. PURPA § 210(d), 16 U.S.C. § 824a–3(d) (1988). By setting a ceiling of incremental cost on the amount a utility could be forced to pay for a QF's power, Congress intended to encourage cogeneration without requiring a utility's ratepayers to subsidize cogenerators. H.R.CONF.REP. No. 1750, 95th Cong., 2d Sess. 98, *reprinted in* 1978 U.S.CODE CONG. & ADMIN.NEWS 7659, 7797, 7832.

Pursuant to this statutory authority, FERC has adopted regulations governing an electric utility's purchases from QFs. *See* 18 C.F.R. pt. 292 (1990). The regulations require that each electric utility "purchase, in accordance with § 292.304, any energy and capacity which is made available from a qualifying facility." *Id.* § 292.303. Section 292.304 sets the rate of payment for such purchases equal to the utility's full avoided cost unless the state regulatory authority (or an unregulated utility) determines that a lower rate is in the public interest and is sufficient to encourage cogeneration. *Id.* § 292.304(b)(2). (The term "full avoided cost" is equivalent to PURPA's "incremental cost.") Finally, the regulations provide that "[n]othing in this subpart ... [l]imits the authority of any electric utility or any [QF] to agree to

---

1. Small power production facilities are those which use biomass, waste, geothermal resources, or renewable resources such as wind, water, or solar energy to produce electrical power.

2. A further obstacle to cogeneration had been the risk that a cogenerator would be considered a public utility and thus be subject to burden-

some state and federal regulation. *FERC v. Mississippi*, 456 U.S. at 750–51, 102 S.Ct. at 2133, 72 L.Ed.2d at 541. PURPA directs FERC to prescribe rules exempting QFs from certain state and federal laws governing conventional electric utilities. PURPA § 210(e), 16 U.S.C. § 824a–3(e) (1988).

a rate for any purchase ... which differ[s] from the rate ... which would otherwise be required by this subpart." *Id.* § 292.301(b)(1).

Because Congress intended that state regulatory authorities be the primary enforcers of PURPA, section 210(f) of PURPA orders each state regulatory authority to implement FERC's rules.[3] 16 U.S.C. § 824–3(f) (1988). In 1981, the Texas legislature added a provision to the Texas Public Utility Regulatory Act (Texas PURA) to the effect that the Commission "shall make and enforce rules reasonably required to implement the rules and regulations of the Federal Energy Regulatory Commission pertaining to the production of electric energy by [QFs]." Act of Apr. 1, 1981, 67th Leg., R.S., ch. 31, § 2, 1981 Tex.Gen.Laws 70, 71. This provision was later amended to order the Commission to "make and enforce rules to encourage the economical production of electrical energy by [QFs]." Act of May 26, 1983, 68th Leg., R.S., ch. 274, § 1, 1983 Tex.Gen.Laws 1258, 1280 (codified at TEX.REV.CIV.STAT.ANN. art. 1446c, § 16(g) (Vernon Supp.1991)). Pursuant to these directives, the Commission has enacted its own rules governing a utility's purchases of power from a QF. Tex.Pub. Util.Comm'n, 16 TEX.ADMIN.CODE § 23.66 (West Sept. 1, 1988) ("Rule 23.66").

The Texas rules apply to FERC-certified QFs, *id.* § 23.66(a)(15), and are very similar to FERC's rules. Rule 23.66(d) of the Texas rules provides that "[i]n accordance with subsections (e)—(h) of this section, each electric utility shall purchase any energy and capacity that is made available from a qualifying facility...." *Id.* § 23.66(d)(1)(A). Rule 23.66(e) requires that rates for such purchases "shall be just and reasonable to the consumers of the electric utility and in the public interest, and shall not discriminate against" QFs. *Id.* § 23.66(e)(1). The rates "shall not exceed avoided cost." *Id.* § 23.66(e)(2). "Avoided cost" has the same meaning as in FERC's regulations. *Id.* § 23.66(a)(2). Rates which equal avoided cost are deemed to be just and reasonable, *id.* § 23.66(e)(3), and such payments are considered "reasonable and necessary operating expenses of [the] utility." *Id.* § 23.66(e)(5).[4] Finally, as in FERC's rules, the Texas rules provide that nothing in the rules "shall limit the authority of any electric utility or any qualifying facility to agree to a rate for any

---

**3.** The U.S. Supreme Court has held that the federal government may constitutionally order the states to implement FERC's regulations through state courts or agencies. *FERC v. Mississippi,* 456 U.S. at 760–61, 102 S.Ct. at 2138, 72 L.Ed.2d at 547–48. Under this federal command, states have the authority to promulgate regulations mirroring the federal regulations. 45 Fed.Reg. 12,216 (1980). However, it is unclear whether, under PURPA, a state may promulgate additional regulations in the field of cogeneration. In general, a state may enact its own laws or regulations as long as the federal authority has not preempted all state efforts to regulate in the area and as long as the state laws or regulations do not conflict with federal laws or regulations. *City of New York v. FCC,* 486 U.S. 57, 64, 108 S.Ct. 1637, 1642, 100 L.Ed.2d 48, 57 (1988). Whether PURPA and the FERC regulations completely preempt state regulation in the area of cogeneration is an open question. The issue of preemption is discussed at *infra* note 11.

**4.** In full, Rule 23.66(e) provides:

> (e) Rates for purchases from a qualifying facility.
>
> (1) Rates for purchases of energy and capacity from any qualifying facility shall be just and reasonable to the consumers of the electric utility and in the public interest, and shall not discriminate against qualifying cogeneration and small power production facilities.
>
> (2) Rates for purchases of energy and capacity from any qualifying facility shall not exceed avoided costs; however, in the case in which the rates for purchase are based upon estimates of avoided costs over the specific term of the contract or their legally enforceable obligation, the rates for such purchases do not violate this subsection if the rates for such purchases differ from avoided costs at the time of delivery.
>
> (3) Rates for purchases satisfy the requirements of paragraph (1) of this subsection if they equal avoided cost.
>
> (4) Rates for purchases from qualifying facilities shall be in accordance with paragraph (1)–(3) of this subsection, regardless of whether the electric utility making such purchases is simultaneously making sales to the qualifying facility.
>
> (5) Payments by a utility to any qualifying facility, if in accordance with paragraphs (1)–(3) of this subsection, shall be considered reasonable and necessary operating expenses by that utility.
>
> 16 TEX.ADMIN.CODE § 23.66(e) (West Sept. 1, 1988).

purchase, or terms or conditions relating to any purchase, which differ from the rate or terms or conditions that would otherwise be required by this subsection." *Id.* § 23.66(b)(2)(A).

The first issue we must address in this case concerns the proper interpretation of the above federal and state regulations governing a utility's purchases of electricity from a QF. The questions presented are (1) whether the regulations prohibit a utility from contracting for and paying a rate *in excess of its avoided cost* and (2) whether, if a utility may pay more than avoided cost, the regulations impose a limitation on how much of these payments the utility can recover from its ratepayers. The controversy arises because both sets of regulations expressly allow a utility and a QF to agree to *any* rate for purchased power, *see* 18 C.F.R. § 292.301(b)(1) (1990); 16 Tex.Ad-min.Code § 23.66(b)(2)(A) (West Sept. 1, 1988), but in subsequent provisions limit purchased power payments to avoided cost. *See* 18 C.F.R. § 292.304(a)(2) (1990); 16 Tex.Admin.Code § 23.66(e)(2) (West Sept. 1, 1988).

B

We consider these questions in light of the circumstances presented by this case. GSU is a public electric utility located in Texas near the Louisiana border. In 1984, two of GSU's largest industrial customers, both situated in Louisiana, notified GSU that they were planning to build a cogeneration facility, which would enable them eventually to withdraw from GSU's system.[5] Normally, the loss of such major customers from GSU's system would result in increases in the rates paid by the remaining customers. These increases would occur because the utility's fixed costs would have to be spread over a smaller number of ratepayers. As a way to keep the industri-

al customers in its system and thereby to prevent such rate increases, GSU proposed the formation of a joint cogeneration venture with the customers.

GSU and three of its Louisiana-based industrial customers eventually entered into an agreement to form the Nelson Industrial Steam Company Project (the Venture). Under the terms of this agreement, GSU agreed to sell two of its electrical generating plants to the Venture and to run the plants on behalf of the Venture.[6] GSU further agreed to purchase the entire electric output from the plants for its general power supply at a price calculated by a contractual formula.[7] In return for GSU's undertakings, the three industrial members of the Venture agreed to continue as GSU's customers. FERC later certified the Venture as a QF, contingent on the Venture's reaching certain milestones in converting the plants from natural gas to petroleum coke operation.

Completion of the agreement to form the Venture was made contingent on the Commission's approval of GSU's proposed rate treatment of certain revenues and expenses arising out of the sale. GSU requested such approval under section 63 of the Texas PURA. This section requires public utilities to report to the Commission any sale of a plant when the total consideration exceeds $100,000. The Commission then must determine if the transaction "is consistent with the public interest." Tex.Rev. Civ.Stat.Ann. art. 1446c, § 63 (Vernon Supp.1991). If the Commission finds that the transaction is *not* in the public interest, the Commission "shall take the effect of the transaction into consideration in the rate-making proceedings" and "shall ... disallow the effect of such transaction if it will unreasonably affect rates or service." *Id.*

---

5. The customers' desire to withdraw was motivated in part by rate increases produced by an *expensive nuclear power plant* that GSU had recently brought on line.

6. GSU would have a 1% interest in the Venture.

7. The contractual formula is based on the current Louisiana tariff for large industrial custom-

ers and on the Venture's production costs, rather than on GSU's avoided cost. Depending on *the values for the factors in the formula,* the purchased power rate may be less than or greater than avoided cost. If the rate exceeds avoided cost, the industrial customers are required to purchase additional amounts of electricity to partially offset GSU's increased cost.

Section 63 does not require a utility to obtain the Commission's approval prior to such sales. Furthermore, the Commission does not set electric utility rates in a section 63 proceeding. Nevertheless, the Commission must determine the effect of a transaction on future ratemaking proceedings in order to determine whether the transaction as proposed will be in the public interest. In their section 63 application, therefore, the parties to the Venture requested a prospective ruling on the future rate treatment that would be granted the transaction. Specifically, GSU requested a ruling from the Commission that GSU be allowed to pass on the full amount of its payments to the Venture for electricity (the purchased power payments) to its ratepayers and that it be allowed to allocate the entire proceeds from the sale of the plant to its shareholders.

After a hearing, the Hearing Examiner determined that the sale of the plants to the Venture was generally in the public interest. The Examiner then found that GSU's purchased power payments might at times exceed GSU's avoided cost. The Examiner determined that avoided cost was the maximum rate that would be deemed just and reasonable and in the public interest under Rule 23.66(e). However, she concluded that GSU should be allowed to seek recovery of any purchased power payments in excess of its avoided cost in future rate or fuel-reconciliation proceedings.[8] In order to recover the payments, GSU would have to show that the

> costs were necessary as a means to keep its industrial load on the system, that the ratepayers benefited by the retention of the industrial load on the system, that the costs in excess of avoided costs were at a minimum, and that given these circumstances, its fuel costs were at their lowest reasonable level.

Tex.Pub.Util.Comm'n, *Application of Gulf States Utils. Co. for Approval of a Joint Venture Cogeneration Project and Treatment of Revenues,* Docket No. 7147, 14 Tex.P.U.C.Bull. 49, 66–67 (Mar. 21, 1988) [hereinafter Docket No. 7147]. The Examiner further determined that it would be unreasonable for the ratepayers to absorb all the costs associated with the purchased power payments. As to the allocation of the sale proceeds, the Examiner concluded that the ratepayers should be credited with 83 percent of the proceeds because they paid for 83 percent of the cost of the plants. The ratepayers' 83 percent share of the proceeds would be deemed "other electric utility income" and would be used to offset the amount of revenue otherwise required to be generated by the rates.

The Commission's final order deleted the Hearing Examiner's findings that GSU could seek recovery of the full amount of its purchased power payments and substituted findings that GSU could *not* recover anything above avoided cost. The final order thus stated that "[i]t is not in the public interest for GSU's Texas ratepayers to pay in excess of GSU's avoided cost for purchased power from a qualifying cogeneration project" and that "[i]n future rate proceedings, [GSU] is limited to recovering those purchased power payments to the Venture that do not exceed GSU's avoided costs."[9] Docket No. 7147, *supra* p. 10, at 98. The parties to the Venture later went ahead with the transaction despite the Commission's disallowance of the requested rate treatment.

GSU appealed to the district court, which affirmed the Commission's order. GSU then appealed to the court of appeals, which reversed the judgment of the district court and remanded to the Commission. The court of appeals held that the Commission's interpretation of Rule 23.66 as imposing a ceiling on negotiated purchased power payments was unreasonable under the text of the provision and contrary to the provisions and purposes of the Texas

---

**8.** At reconciliation proceedings, a utility's fuel costs over a period are reconciled with the projected costs for that period and a credit or charge is assessed to the ratepayers accordingly. *See* 16 Tex.Admin.Code § 23.23(b)(2)(H) (West Sept. 1, 1988).

**9.** One of the Commissioners dissented from the part of the final order limiting GSU's recovery to avoided cost.

PURA. 784 S.W.2d at 528. The court of appeals also held that the Commission's allocation of the sale proceeds was not supported by substantial evidence in the record. 784 S.W.2d at 533.

## II

We first address that part of the Commission's order holding that GSU cannot recover from its ratepayers purchased power payments in excess of avoided cost. The Commission's ruling is based on its interpretation of the state regulations, in particular Rule 23.66. As described above, Rule 23.66(b)(2)(A) allows utilities and QFs to agree to *any* rate, while Rule 23.66(e) states that purchases of energy from QFs shall not exceed avoided cost. Thus, the two rules appear to conflict. The Commission attempts to harmonize the two rules by interpreting them to permit a utility and a QF to contract only for rates *below* avoided cost. The Commission also argues that, even if Rule 23.66(b) allows a utility to *pay* a rate above avoided cost, Rule 23.66(e) prohibits a utility from *recovering* from its ratepayers any payments, whether negotiated or compelled, in excess of avoided cost. According to the Commission, Rule 23.66(e) provides that only those payments that are equal to avoided cost are just, reasonable, and in the public interest. Therefore, it is not just, reasonable, or in the public interest for the ratepayers to pay more than avoided cost under any circumstances. Finally, the Commission argues that FERC's regulations also place a limit of avoided cost on purchased power payments.

The Commission's interpretation of its own regulations is entitled to deference by the courts. *See Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, 625 (1965); *Lloyd A. Fry Roofing Co. v. State,* 541 S.W.2d 639, 644 (Tex.Civ.App.—Dallas 1976, writ ref'd n.r.e.). Our review is limited to determining whether the administrative interpretation "is plainly er-

roneous or inconsistent with the regulation." *United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48, 56 (1977) (quoting *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700, 1702 (1945)). However, if the Commission has failed to follow the clear, unambiguous language of its own regulation, we must reverse its action as arbitrary and capricious. *See Sam Houston Elec. Coop., Inc. v. Public Util. Comm'n,* 733 S.W.2d 905, 913 (Tex.App.—Austin 1987, writ den'd); *see also Lewis v. Jacksonville Bldg. & Loan Ass'n,* 540 S.W.2d 307, 310 (Tex.1976), *and Ex parte Roloff,* 510 S.W.2d 913, 915 (Tex. 1974).[10]

We hold that the Commission acted arbitrarily in adopting an interpretation contrary to the plain language of its regulation. Rules 23.66(b)(2)(A) and 23.66(e) can be harmonized, but not in the manner suggested by the Commission. We read Rule 23.66(e) as operating solely to set the rates that the Commission can *compel* a utility to pay for a QF's power if the utility and the QF are unable to reach a voluntary agreement. Rule 23.66(e) does not impose a ceiling on the amount a utility can *contract* to pay for a QF's power, nor does it limit the amount a utility can recover from its ratepayers under such voluntary arrangements.

Our interpretation is based on the interaction between Rule 23.66(e) and Rules 23.66(d) and 23.66(b). Rule 23.66(d) obligates a utility to purchase power from a QF if the QF makes such power available. Subsection (d) also provides that the rates for purchases made under that subsection are governed by Rule 23.66(e). *See* 16 Tex.Admin.Code § 23.66(d)(1)(A) (West Sept. 1, 1988) ("In accordance with subsection[ ] (e) ... of this section, each electric utility shall purchase any energy and capacity that is made available from a [QF]...."). Rule 23.66(e)'s avoided-cost rules therefore do

---

**10.** The standard for reviewing the Commission's interpretation of its regulations that were promulgated to implement *federal* law, as well as for reviewing the Commission's interpretation of *federal* regulations, might well be less defer-

ential. However, in the absence of any requests from the parties to use a different standard, we apply the deferential standard enunciated in the text to all of the Commission's interpretations in the present case.

not apply to voluntary contracts arranged outside the requirements of Rule 23.66(d). This interpretation of subsections (d) and (e) is in harmony with the plain language of Rule 23.66(b), which permits a utility and a QF "to agree to a rate which differ[s] from the rate that would otherwise be required" whether *above, below, or equal to* avoided cost. We find *no justification in the language* of Rule 23.66(b) to support the Commission's interpretation that subsection (b) allows a utility to contract for any price *below* avoided cost but not for a price *above* avoided cost. Finally, because Rule 23.66(e) does not apply to contractual arrangements between utilities and QFs, it does not impose any limitation on the amount a utility can recover from its customers for such contractual payments. The provision that payments equal to avoided cost "shall be considered reasonable and necessary operating expenses of that utility" merely ensures that a utility can recover the full amount of the payments it is *compelled* to make by the Commission. Subsection (e)(5) does not provide that contractual payments above avoided cost can *never* be considered reasonable and necessary operating expenses of the utility.

We must also consider the application of PURPA and the federal regulations because the transaction between GSU and the Venture is governed by federal law as well as by Texas law. The interstate activities of GSU clearly bring it within the reach of the federal regulations. *FERC v. Mississippi,* 456 U.S. 742, 757, 102 S.Ct. 2126, 2136, 72 L.Ed.2d 532, 545 (1982). In addition, to the extent that the state regulations implement PURPA, the federal regulations serve as a guideline to and may control the scope of the state regulations.

■ We hold that the federal regulations do not grant the Commission any more authority to regulate negotiated purchases than do the state regulations.[11] Like the Texas regulations, the federal regulations do not authorize the Commission to alter the terms of a purchased power contract between a utility and a QF. Neither do they set a limit of avoided cost on the amount of such payments a utility can recover from its ratepayers. Thus, section 292.303(a) of the federal regulations provides that a utility is obligated to purchase any energy and capacity made available from a QF. Such purchases must be made in accordance with section 292.304, which sets the rate for purchases at avoided cost. Because section 292.304 is applied through section 292.303, the avoided-cost limit applies only to compelled purchases. This interpretation of sections 292.303 and 292.-304 is in harmony with the language of section 292.301(b)(1), which provides that nothing is to limit the authority of a utility or QF "to agree to a rate for any purchase ... which differ[s] from the rate ... which would otherwise be required by this sub-

---

11. Because we find that the federal and state regulations are identical in this regard, we do not reach the issue of whether the federal law preempts state regulation in the area of cogeneration. To the extent that the Texas regulations imposed different requirements than did the federal regulations, it would be necessary to determine whether the federal law preempted Texas regulation. The answer is unclear. As discussed *supra* note 3, PURPA directs states to implement FERC's rules; however, neither PURPA nor the federal regulations expressly state whether additional state regulation is preempted.

The preemption issue has previously arisen in situations where states have tried to impose a compelled rate that is higher than FERC's avoided cost ceiling. FERC originally stated that "the States are free ... to enact laws or regulations providing for rates which would result in even greater encouragement of these technologies," i.e., rates above avoided cost. 45 Fed.Reg. 12,-

221 (1980). In 1988, FERC proposed changes to the regulations that would prohibit states from setting a compelled rate higher than avoided cost. 53 Fed.Reg. 9331 (1988); *see Occidental Chem. Corp. v. FERC,* 869 F.2d 127, 128 (2d Cir.1989). These changes are still pending. Prior to these recent developments, the lower federal courts had disagreed on whether PURPA preempts state regulations that set a price above avoided cost. *Compare Consolidated Edison Co. v. Public Serv. Comm'n,* 63 N.Y.2d 424, 436 n. 8, 483 N.Y.S.2d 153, 157 n. 8, 472 N.E.2d 981, 985 n. 8 (1984) *with Kansas City Power & Light Co. v. State Corp. Comm'n,* 234 Kan. 1052, 1057–58, 676 P.2d 764, 767–68 (1984). The Supreme Court has declined to address the issue. *See Consolidated Edison Co. v. Public Serv. Comm'n,* 470 U.S. 1075, 105 S.Ct. 1831, 85 L.Ed.2d 132 (1985) (dismissing the appeal from the Court of Appeals of New York for want of a substantial federal question).

part." [12] 18 C.F.R. § 292.301(b)(1) (1990). *See American Paper Inst., Inc. v. American Elec. Power Serv. Corp.*, 461 U.S. 402, 416, 103 S.Ct. 1921, 1930, 76 L.Ed.2d 22, 35 (1983) ("The Commission's [full-avoided-cost] rule simply establishes the rate that applies in the absence of a waiver or a specific contractual agreement."); [13] *see also In re Vicon Recovery Sys.*, 153 Vt. 539, 572 A.2d 1355, 1358 (1990) ("The rate provisions of § 292 apply only ... in a situation where the electric utility is forced to purchase power from the small producer. The regulations make clear that utilities and [QFs] can *agree* to a rate different than would otherwise be mandated."); *Barasch v. Public Util. Comm'n*, 119 Pa. Cmwlth. 81, 546 A.2d 1296, 1300 ("privately negotiated contracts setting rates for QF power are essentially outside the federal and state rules"), *modified*, 119 Pa. Cmwlth. 81, 550 A.2d 257 (1988) (holding that previous opinion was to have prospective effect only); *Bates Fabrics Inc. v. Public Utils. Comm'n*, 447 A.2d 1211, 1214 (Me.1982) ("We conclude that the federal scheme expressly excludes from its reach all otherwise binding contracts between utilities and" QFs.). Finally, the regulations say nothing about how much of its purchased power payments a utility can recover from its ratepayers.

■ Our holding that the state and federal regulations governing a utility's purchases of power from a QF do not apply to voluntary arrangements between a utility and a QF does not deprive the Commission of its regulatory authority over the amount of such contractual payments that a utility may recover from its customers. GSU may contract for any purchase price it wishes; however, whether such cost will be fully recoverable from the ratepayers will be subject to the Commission's ordinary ratemaking powers. GSU's purchase of electricity from the Venture is a fuel cost, *see* 16 TEX.ADMIN.CODE § 23.23(b)(2)(B) (West Sept. 1, 1988), which, like any other expense, is subject to disallowance by the Commission upon a finding that the expense is unreasonable, unnecessary, or not in the public interest.[14] *See* TEX.REV.CIV. STAT.ANN. art. 1446c, §§ 38, 39(a), 41(c)(3)(D) (Vernon Supp.1991); [15] 16 TEX.

**12.** FERC's comments accompanying the federal regulations adopt this interpretation:

Paragraph (b)(1) [allowing utilities and QFs to agree to any rate] reflects the Commission's view that the rate provisions of section 210 of PURPA apply only if a [QF] chooses to avail itself of that section. Agreements between an electric utility and a [QF] for purchases at rates different than rates required by these rules ... do not violate the Commission's rules under section 210 of PURPA. The Commission recognizes that the ability of a [QF] to negotiate with an electric utility is buttressed by the existence of the rights and protections of these rules.

45 Fed.Reg. 12,217 (1980).

**13.** We disagree with the Commission's interpretation of the Supreme Court's comment that "a qualifying facility and a utility may negotiate a contract setting a price that is lower than a full avoided cost rate." *American Paper Inst.*, 461 U.S. at 416, 103 S.Ct. at 1930, 76 L.Ed.2d at 35. We do not read this statement to mean that a utility may not negotiate for a price *above* avoided cost because the Court was not asked to consider the status of prices above avoided cost.

**14.** Allowing the Commission to examine the fairness and reasonableness of GSU's payments to the Venture will not result in the improper application of ratemaking principles to cogenerators, as the Commission warns. Congress intended that cogenerators not be subject to the "type of examination that is traditionally given to electric utility rate applications to determine what is the just and reasonable rate that they should receive for their electric power." H.R. Conf.Rep. No. 1750, 95th Cong., 2d Sess. 97, *reprinted in* 1978 U.S.Code Cong. & Admin. News 7797, 7831. However, the Commissioner's task in this case is to analyze the purchased power rate in terms of its fairness *to GSU's ratepayers*, not its fairness *to the Venture*, and the former inquiry will not involve application of ratemaking principles *to the Venture*.

**15.** We do not agree with the court of appeals that Texas PURA section 41A is applicable here. Under section 41A, a voluntary purchased power agreement between a utility and a QF may be certified by the Commission if "the payments provided for in the agreement over the contract term are equal to or less than the utility's avoided costs as established by the commission and in effect at the time the agreement was signed...." Once certified, the payments under the agreement are presumed to be reasonable and necessary expenses of the utility in any future rate proceedings. In the present case, however, section 41A does not apply because GSU has not requested section 41A certification. Furthermore, we do not think this specific certification procedure was meant to deprive a utility of its Rule 23.66(b) power to contract for a rate above avoided cost.

ADMIN.CODE § 23.23(b) (West Sept. 1, 1988) (utility must show that contract negotiations for purchased power have produced the lowest reasonable cost of fuel to ratepayers); *see also Suburban Util. Corp. v. Public Util. Comm'n,* 652 S.W.2d 358, 362 (Tex.1983) ("The PUC's ratemaking power includes the discretion to disallow improper expenses."). In fact, section 63, under which this proceeding was brought, expressly orders the Commission to disallow any effect of the transaction that will unreasonably affect rates.

The Commission suggests that it would never be fair to the ratepayers for a utility to pay in excess of its avoided costs for power since *by definition* the utility could obtain the same amount of power elsewhere by paying avoided cost. But using this argument to set an absolute ceiling on purchased power payments ignores the plain language of the Commission's own rules, which do not authorize the Commission to impose a ceiling of avoided cost on such payments. Under the rules, the Commission must conduct an *independent, factual* inquiry in each case to determine whether payments in excess of avoided cost are reasonable and necessary, considering the effects of the transaction as a whole.[16]

Because the Commission was not called upon to set rates in the section 63 proceeding from which this case arose, we do not remand this part of the case to the Commission. Instead, we order the Commission to allow GSU to recover purchased power payments in excess of its avoided cost in future rate proceedings if GSU establishes to the Commission's satisfaction that the payments are reasonable and necessary expenses. The Commission contends that, since GSU and the industrial customers have already gone ahead with the Venture, GSU can no longer justify the

payments on the grounds that they are necessary to retain the customers in the system. However, we believe that it may still be possible for GSU to establish the necessity of the Venture and the contractual rates. GSU should be allowed to show that, absent the Venture, the industrial customers would have left its system because independent cogeneration was economically more attractive than remaining in the system, that the contractual rates are necessary to make the Venture more attractive than independent cogeneration, and that such rates are at the minimum level. If GSU is able to satisfy the Commission that payments above avoided cost are justified, then the Commission should determine what portion of the costs of the Venture it is reasonable and necessary for the ratepayers to bear, given the distribution of benefits from the Venture to the ratepayers and to the shareholders.[17]

III

▇ The second issue we must resolve is whether the Commission properly allocated the gains from the sale of the plants between GSU's ratepayers and its shareholders. Under the agreement, the Venture is to pay for the plants in twenty annual installments of $6.35 million each (the fixed asset payments), for a total income stream of $127 million. GSU requested that it be allowed to allocate the entire amount of each fixed asset payment, i.e., the entire proceeds of the sale, to its shareholders. The Commission instead ordered that GSU allocate 83 percent of each fixed asset payment, or 83 percent of the total sale proceeds, to its ratepayers, thereby reducing the amount the utility was entitled to recover through its rates by that amount.

▇ We must reverse the Commission's allocation of the profits if it is not

16. We reject the Office of Public Utility Counsel's alternative argument that the Commission's holding was based on its independent determination that, on the facts of this case, payments in excess of avoided cost were unreasonable expenses under the general standards for allowability of expenses or fuel costs. It is clear from the Commission's Final Order, as well as from the Commission's own position in this appeal,

that the Commission's interpretation of Rule 23.66 formed the only basis for its decision.

17. In conducting this latter inquiry, the Commission should consider the benefits accruing to GSU's shareholders because of GSU's 1% share in the Venture, as well as any other income earned by GSU as a result of its operation of the plants on behalf of the Venture.

reasonably supported by substantial evidence in the record or if the Commission's action was arbitrary, capricious, or an abuse of discretion. Administrative Procedure and Texas Register Act, TEX.REV.CIV. STAT.ANN. art. 6252–13a, § 19(e)(5), (6) (Vernon Supp.1991); *Railroad Comm'n v. Continental Bus Sys.*, 616 S.W.2d 179, 181 (Tex.1981). Our inquiry is whether the Commission's decision is reasonably supported by substantial evidence in view of the reliable and probative evidence in the record as a whole. *Texas Health Facilities Comm'n v. Charter Medical–Dallas, Inc.*, 665 S.W.2d 446, 452 (Tex.1984). Agency decisions that are not supported by substantial evidence are deemed arbitrary and capricious. *Id.* at 454. In applying this test, we may not, however, substitute our judgment as to the weight of the evidence for that of the agency. *Id.* at 452.

The Commission's decision to allocate 83 percent of the fixed asset payments to the ratepayers is based on the testimony of the Office of Public Utility Counsel's witness Dr. Steven Anderson and of the Commission's staff accountant Paul Bellon. GSU has indirectly recovered 83 percent of the cost of the plants from the ratepayers through depreciation expense allowed for the plants and figured into the rate base. Both Anderson and Bellon testified that "because the Company and the shareholders have recovered 83 percent of the costs related to [the generating facilities], the ratepayers should receive 83 percent of the fixed asset payment GSU receives from the sale of the units." Docket No. 7147, *supra* p. 10, at 56.

■ We hold that the Commission's decision is not reasonably supported by substantial evidence in the record. The Commission based its decision solely on conclusory testimony that cites only the evidence of the ratepayers' contribution to depreciation. The Commission did not consider any other factors that would be relevant to allocation of a utility's proceeds from the sale of assets. The issue of the proper allocation of such proceeds is a complicated one that cannot be resolved simply by reference to who paid for the property. *See*

*Washington Pub. Interest Org. v. Public Serv. Comm'n*, 393 A.2d 71, 72 (D.C.1978); *see also Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n*, 485 F.2d 786 (D.C.Cir.1973); *Kansas Power & Light Co. v. State Corp. Comm'n*, 5 Kan.App.2d 514, 620 P.2d 329 (1980). A proper allocation of proceeds can be determined only by an analysis of all the equities involved. *See, e.g., Democratic Cent. Comm.*, 485 F.2d at 821; *Kansas Power & Light Co.*, 620 P.2d at 340.

The equitable principles commonly used to resolve allocation problems are that "benefits should follow burdens" and that "gain should follow risk of loss." *Democratic Cent. Comm.*, 485 F.2d at 806; *Washington Pub. Interest Org.*, 393 A.2d at 92. In other words, in the general case, the gain should be allocated to that group (as between shareholders and ratepayers) that has borne the financial burdens (e.g., depreciation, maintenance, taxes) and risks of the asset sold. In addition to these two general equitable factors, courts have also considered numerous other factors, including whether the asset sold had been included in the rate base over the years, whether the asset was depreciable property, nondepreciable property, or a combination of the two types, the impact of the proposed allocation on the financial strength of the utility, the reason for the asset's appreciation (e.g., inflation, a general increase in property values in the area), any advantages enjoyed by the shareholders because of favored treatment accorded the asset, the dividends paid out to the shareholders over the years, and any extraordinary burdens borne by the ratepayers in connection with that asset. *See Democratic Cent. Comm.*, 485 F.2d at 791–92, 821–22; *id.* at 831–32, 841–44 (MacKinnon, J., concurring in part and dissenting in part); *Washington Pub. Interest Org.*, 393 A.2d at 89, 91–92; *Kansas Power & Light Co.*, 620 P.2d at 341.

In the present case, the Commission allocated the sale proceeds in direct proportion to the amount the shareholders and the ratepayers contributed to the cost of the plants. This formula is based on only one of the above principles, that benefits should follow burdens. In addition to ignoring the

other considerations outlined above,[18] the Commission did not articulate its reasons for concluding that the ratepayers are entitled to a percentage of the proceeds exactly equal to the percentage of the cost they have paid. The Commission cited only the testimony of witnesses Anderson and Bellon but there is no evidence in the record to explain how they reached their conclusions. We therefore hold that the Commission's allocation is not supported by substantial evidence because we find that the evidence the Commission cited does not support its decision and because the Commission failed to consider evidence relating to other relevant factors. We remand the case to the Commission for it to recalculate the allocation of the fixed asset payments along the lines of the analysis suggested above, although we do not require the Commission to consider all of the above factors nor forbid it from considering others. However, the Commission should set forth the factors it considers relevant and should explain how these factors are evaluated in the present case.

## IV

For the reasons stated above, we affirm the judgment of the court of appeals. This case is therefore remanded to the Commission for it to determine the proper allocation between the shareholders and ratepayers of the fixed asset payments after consideration of the factors the Commission determines are appropriate. The Commission is further ordered to allow GSU to recover its purchased price payments in future rate proceedings if GSU shows that the payments are reasonable and necessary expenses.

**18.** The Commission itself had previously recommended that some of these factors be considered in allocation of gain cases. *See* Tex. Pub.Util.Comm'n, *Application of Gulf States Utils. Co. for Authority to Change Rates and Inquiry of the Public Util. Comm'n of Tex. into the Prudence and Efficiency of the Planning and Management of the River Bend Nuclear Generating Station,* Docket Nos. 7195 & 6755, 14 Tex.P. U.C.Bull. 1943, 2217 (May 16, 1988) (suggesting that the analysis described in Judge MacKinnon's concurring and dissenting opinion in *Democratic Cent. Comm.* be used in future allocation cases). While we do not necessarily endorse these precise factors, we do endorse the

GONZALEZ, Justice, concurring and dissenting.

I concur with the court that PUC's allocation of the fixed asset payments is not supported by the record. However, I disagree with the court's conclusion that PUC's interpretation of its own rule was erroneous or arbitrary. In my opinion, PUC correctly interpreted its own Rule 23.-66 to hold that GSU cannot recover from its ratepayers an amount exceeding its "avoided costs."[1] For this reason, I dissent from part II of the court's opinion.

## FEDERAL LAW—THE AVOIDED COST RULE

In 1978, the United States Congress enacted the Public Utility Regulatory Policies Act of 1978 (PURPA). PURPA established the utility's incremental cost of alternative electric energy as the ceiling on payments to cogenerators. The term incremental cost is defined in the Act as the cost of the energy which, but for the purchase from the cogenerator, such utility would generate or purchase from another source. 16 U.S.C. § 824a–3(d) (1988). Incremental cost is referred to as "avoided cost" in the Texas Public Utility Regulatory Act (PURA). Tex.Rev.Civ.Stat.Ann. art. 1446c (Vernon Supp.1991). With respect to rates for purchases of electricity from qualifying facilities (QFs), Congress provided that the rate

(1) shall be just and reasonable to the electric consumers of the electric utility and in the public interest, and

(2) shall not discriminate against qualifying cogenerators or qualifying small power producers.

general approach of considering various equitable factors, such as those discussed in the text, in allocation determinations.

**1.** "Avoided costs" is defined by the substantive rules of the PUC as:

The incremental costs to an electric utility of electric energy or capacity or both, which, but for the purchase from the qualifying facility or qualifying facilities, such utility would generate itself or purchase from another source. Tex.Pub.Util.Comm'n, 16 Tex.Admin.Code § 23.66(a)(2) (West Sept. 1, 1988) (Arrangements Between Qualifying Facilities and Electric Utilities).

No such rule prescribed under subsection (a) of this section shall provide for a rate which exceeds the incremental cost to the electric utility of alternative electric energy.

16 U.S.C. § 824a–3(b) (1988). In enacting PURPA, Congress was mindful to maintain the balance between encouraging cogeneration and not shifting the burden of cost to the ratepayer. The congressional intent for the incremental cost limitation "was to ensure that PURPA did not become a utility-funded welfare program for QFs, since such 'funding' would essentially come from the pockets of electric consumers." *Greensboro Lumber Co. v. Georgia Power Co.*, 643 F.Supp. 1345, 1369 n. 30 (N.D.Ga. 1986), *aff'd*, 844 F.2d 1538 (11th Cir.1988). The concept of limiting purchased power payments to QFs at or below avoided cost maintains that balance. Pursuant to the authority granted to it by PURPA, the Federal Energy Regulatory Commission (FERC) adopted rules and regulations pertaining to cogeneration and small power production. 18 C.F.R. Part 292 (1990). These regulations require the rates for the purchase of electricity from federal qualifying cogeneration facilities to be based on avoided cost and establish avoided cost as the maximum rate. 18 C.F.R. § 292.304(b)(3) (1990). The United States Supreme Court has found that FERC has

the authority to adopt a full avoided cost rule, and to set full avoided cost as the maximum rate. *American Paper Inst., Inc. v. American Elec. Power Serv. Corp.*, 461 U.S. 402, 103 S.Ct. 1921, 76 L.Ed.2d 22 (1983).[2] FERC has done so. Thus, federal law sets avoided cost as the maximum rate.[3]

### THE PUBLIC UTILITY REGULATORY ACT

In section 41A of the Public Utility Regulatory Act, the Texas legislature enacted similar provisions controlling transactions between electric utilities and qualifying cogenerators. Section 41A states in pertinent part:

(b) If an electric utility and a qualifying facility enter into an agreement providing for the purchase of capacity ... the commission shall determine whether:

(1) the payments provided for in the agreement over the contract term *are equal to or less than the utility's avoided costs* as established by the commission and in effect at the time the agreement was signed....

PURA, § 41A(b)(1) (emphasis added). Section 41A of PURA requires an automatic determination that prices paid for power from a qualifying facility that are at or below avoided cost are just and reasonable.[4] The PUC's prohibition on prices in

**2.** In referring to contractual agreements, the Court cited 18 C.F.R. § 292.301(b)(1), which is identical to § 23.66(b)(2)(A), for the principle that "a qualifying facility and a utility may negotiate a contract setting a price that is *lower* than a full-avoided-cost rate." 461 U.S. at 416, 103 S.Ct. at 1930 (emphasis added). Thus, the full-avoided-cost rule sets the maximum rate that applies in the absence of a FERC waiver. Nowhere in *American Paper* is there any indication that a utility and a QF may negotiate a rate that is above avoided cost.

**3.** All parties agree that the FERC regulations preempt a contrary interpretation by the PUC. The PUC and the Office of Public Utility Counsel (OPC) contend that the PUC has no authority under federal law to approve a rate in excess of avoided cost. GSU argues that the PUC is misinterpreting the FERC regulation. GSU's interpretation is contrary to the stated purpose of PURPA. If GSU is given free rein to charge the public for QF purchases in excess of avoided cost, the revenue collected from the utility's

customers will exceed the revenues that would have been collected if the utility had procured power from other sources. Such a free rein would permit a utility and willing cogenerator to circumvent the rule's protection of the general public by simply converting the transaction into contractual form. So long as the utility may freely pass-through excessive QF prices to the general public, there is no inherent motivation for either the utility or the cogenerator to protect ratepayers from rapidly escalating revenue requirements. This result is inconsistent with the congressional intent behind PURPA.

**4.** Section 41A(c) requires the PUC to certify that the agreement meets the avoided cost limitation of subsection (b)(1). Subsection (c) provides that "[i]n setting the electric utility's rates for a period during which the certification is effective, the regulatory authority shall consider payments made under the agreement to be reasonable and necessary operating expenses of the electric utility."

excess of avoided cost conforms to the requirement of PURA § 41A which obligates the PUC to approve an *agreement* between a QF and a utility so long as it determines that payments "are equal to or less than the utility's avoided cost."

### RULE 23.66(e)(2)—THE AVOIDED COST LIMITATION

Pursuant to its obligation under PURA § 16(g), the PUC enacted rules governing the recovery of fuel costs and agreements between electric utilities and QFs. The PUC limited a utility's recovery of purchased power payments to a QF to that utility's "avoided cost." Tex.Pub.Util. Comm'n, 16 Tex.Admin.Code §§ 23.-23(b)(4)(A), 23.66(e) (West Sept. 1, 1988). In pertinent part, section 23.66(e) states:

(1) Rates for purchases of energy and capacity from any qualifying facility shall be just and reasonable to the consumers of the electric utility and in the public interest, and shall not discriminate against qualifying cogeneration and small power production facilities.

(2) Rates for purchases of energy and capacity from any qualifying facility shall not exceed avoided cost; ....

(3) Rates for purchases satisfy the requirements of paragraph (1) of this subsection if they equal avoided cost.

The PUC interprets this rule to mean that only if a utility's purchased power payments to the QF equal avoided costs or are lower than the avoided costs may those rates be deemed just and reasonable and in the public interest. Because GSU's purchased power payments to the QF were not tied to its avoided cost but rather to a contractual rate, the PUC rejected GSU's request for an automatic pass-through under section 63 of PURA and limited GSU's recovery for those payments from its Texas ratepayers to its avoided cost.

GSU contends that section 23.66(b)(2)(A) allows it to contractually agree to a rate in excess of its avoided cost. Section 23.-66(b)(2)(A) provides:

Nothing in this subsection:

(A) shall limit the authority of any electric utility or any qualifying facility to agree to a rate for any purchase, or terms or conditions relating to any purchase, which differ from the rate or terms or conditions that would otherwise be required by this subsection.

GSU argues that pursuant to section 23.-66(b)(2)(A), the avoided cost ceiling in Rule 23.66(e) applies only to contracts that are initiated under the mandatory terms of the rule, as opposed to voluntarily negotiated contracts between electric utilities like GSU and QFs. The PUC rejected this argument. I agree with the PUC.

In a seemingly innocuous statement purporting to interpret Rule 23.66(d), the majority states that "Rule 23.66(e)'s avoided-cost rules ... do not apply to voluntary contracts arranged outside the requirements of Rule 23.66(d)." at 207–08. Although Rule 23.66(d) does require utilities to purchase power when a QF makes it available, the language of the rule does not support the majority's contention that "the avoided-cost limit applies only to compelled purchases." *Id.* at 208. The conclusion that the avoided-cost rules do not apply to voluntary contracts is without foundation. PURA simply does not distinguish between voluntary and involuntary agreements. Subsection 23.66(b)(2) in no way provides that rule 23.66 does not apply to a "negotiated" rate. It merely makes clear that the parties can negotiate a rate other than the avoided cost. *See, e.g.,* 16 Tex.Admin.Code § 23.66(d)(1)(F)(iv) (West Sept. 1, 1988) (when purchasing capacity parties can negotiate for price *lower* than avoided cost). Nothing in rule 23.66 provides that the utility may recover an amount greater than the avoided cost from the ratepayers.

Further, the court's construction would effectively destroy the avoided cost rule. The court's interpretation allows the utility and QF freedom to agree on a rate as provided for in section 23.66(b)(2)(A) to trump the rule that rates for purchases shall not exceed avoided costs (Rule 23.-66(e)(2)), yet still requires the agreed rate to "be just and reasonable," as is required

in Rule 23.66(e)(1). There is no logical reason to interpret Rule 23.66(2)(a) to trump Rule 23.66(e)(2), yet be subject to the requirement of Rule 23.66(e)(1). Further, the very avoided cost limitation of Section 23.66(e)(2) which GSU asserts to be inapplicable to "negotiated contracts" contains explanatory language referring to "estimates of avoided costs over the specific term of the *contract* or other *legally enforceable obligation.*" Thus, the drafters of section 23.66 envisioned the application of an avoided cost standard to negotiated contracts.

To allow GSU to pass on the costs of production from the venture even if they exceed the avoided cost rule allows utilities to make a complete end run around the rule and in the process completely eviscerate it. In other words, GSU is restricted from raising its rates by the avoided cost rule so it sells its plants to a joint venture in which it maintains an ownership interest. GSU then repurchases the electricity at a higher rate than its avoided cost and, because of the majority's opinion, is allowed to pass through that extra expense to its Texas ratepayers while creating windfall earnings for GSU's investors. GSU is having its cake and eating it too. It receives management fees, a percentage of the price that is paid to the venture, *and* it receives a profit when that very same energy is sold at higher rates as a result of the production costs that are passed through to ratepayers even though those costs are in excess of the avoided cost rule. This is exactly the type of activity that is prohibited by the avoided cost rule.

An agency's interpretation of its own regulations should be given deference by the courts. *See United States v. Larionoff,* 431 U.S. 864, 872–73, 97 S.Ct. 2150, 2155–56, 53 L.Ed.2d 48 (1977); *Calvert v. Kadane,* 427 S.W.2d 605, 608 (Tex.1968); *Lloyd A. Fry Roofing Co. v. State,* 541 S.W.2d 639, 644 (Tex.Civ.App.—Dallas 1976, writ ref'd n.r.e.). In my opinion, the PUC's interpretation of its rules is not arbitrary, capricious nor plainly erroneous. Accordingly, I would hold that the PUC correctly interpreted Rule 23.66 to limit GSU's recovery to its avoided costs.

MAUZY, Justice, concurring and dissenting.

This utility case presents two issues involving the respective burdens of shareholders and ratepayers. In disposing of both issues, the majority heeds the complaints of the utility company, but fails to recognize the burdens borne by the ratepayers. I dissent from part II of the majority opinion, and concur only in the result of part III.

As to the first issue, I agree with Justice Gonzalez that Rule 23.66(e) prohibits a utility from recovering purchased power payments in excess of the utility's avoided cost. Nothing in either the language or the history of that rule suggests that its terms are inapplicable to negotiated contracts. Certainly, a utility may contract for a rate which is *lower* than its incremental cost; but the governing federal statute explicitly prohibits the adoption of a rate which exceeds the utility's incremental cost. 16 U.S.C. § 824a–3(b)(1988). Thus, Rule 23.66(e)(2) should be read to mean exactly what it says: that a utility's purchase rate "shall not exceed avoided cost." *See American Paper Inst., Inc. v. American Elec. Power Serv. Corp.,* 461 U.S. 402, 416, 103 S.Ct. 1921, 1930, 76 L.Ed.2d 22, 35 (1983) ("[A] qualifying facility and a utility may negotiate a contract setting a price that is *lower* than a full avoided cost rate.") (emphasis added).

As to the allocation of proceeds from asset sales, I agree that the Commission should have considered factors other than the relative contributions to depreciation. I would emphasize, however, that the Commission's discretion in this context is sharply limited. By shouldering the main financial burdens associated with utilities, and by assuming the risk of loss, ratepayers establish valid interests in utility assets. Those interests must be taken into account whenever such assets are sold; any failure to do so will necessarily rise to an abuse of discretion.