# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00442-CV

**Mont Belvieu Caverns, LLC, Appellant**

**v.**

**Texas Commission on Environmental Quality; and Zak Covar,
Successor to Mark R. Vickery, Executive Director of
the Texas Commission on Environmental Quality, Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT
## NO. D-1-GN-09-000043, HONORABLE TIM SULAK, JUDGE PRESIDING

## O P I N I O N

Mont Belvieu Caverns, LLC, appeals a final summary judgment that it take nothing in a suit for judicial review of a Texas Commission on Environmental Quality (TCEQ) order determining that a new brine-pond system Mont Belvieu had installed at one of its facilities did not qualify for the "pollution control property" tax exemption. *See* Tex. Tax Code Ann. § 11.31 (West Supp. 2011).[1] Mont Belvieu brings two issues, urging that (1) the district court erred in granting the summary judgment and in denying a cross-motion Mont Belvieu had filed; and (2) the district court abused its discretion in denying Mont Belvieu certain discovery. We will overrule these issues and affirm the district court's judgment.

---

[1] We cite the current versions of statutes and rules where there has been no material intervening substantive change.

**BACKGROUND**

**Regulatory context**

To best understand the relevance and legal significance of the historical facts underlying this appeal, it is helpful to begin with an explanation of the regulatory regime through which the "pollution control property" exemption is administered and TCEQ's role within it.[2]

*Statutory framework*

In November 1993, Texas voters ratified amendments to their state constitution authorizing the Legislature to enact general laws exempting from ad valorem taxation "all or part of real and personal property used, constructed, acquired, or installed" after January 1, 1994, "wholly or partly to meet or exceed rules or regulations adopted by any environmental protection agency of the United States, this state, or a political subdivision of this state for the prevention, monitoring, control, or reduction of air, water, or land pollution." Tex. Const. art. VIII, § 1-1 (adopted at the Nov. 2, 1993 election (*see* Tex. H.J.R. Res. 86, § 2, 73d Leg., R.S., 1993 Tex. Gen. Laws 5576)).[3] Conditioned on ratification, the Legislature enacted a new section 11.31 of the tax code, which took effect on January 1, 1994. *See* Act of May 10, 1993, 73d Leg., R.S., ch. 285, §§ 1, 5 (codified as amended at Tex. Tax Code Ann. § 11.31). Subsection (a) of section 11.31 states that "[a] person is entitled to an exemption from taxation of all or part of real and personal property that the person

_____

[2] Some of the ensuing discussion concerns actions or events involving TCEQ's predecessor agency, the Texas Natural Resource Conservation Commission. For clarity, and because there is no distinction between the two that is material to our analysis, we use "TCEQ" to refer to both TNRCC and TCEQ.

[3] The amendment thereby created an exception to article VIII's general requirements that "[t]axation shall be equal and uniform" and that "[a]ll real property and tangible personal property in this State . . . shall be taxed in proportion to its value." *See* Tex. Const. art. VIII, § 1(a)-(b).

owns and that is used wholly or partly as a facility, device, or method for the control of air, water, or land pollution." Tex. Tax Code Ann. § 11.31(a). A "facility, device, or method for the control of air, water, or land pollution," is defined in subsection (b) of section 11.31 as:

> land that is acquired after January 1, 1994, or any structure, building, installation, excavation, machinery, equipment, or device, and any attachment or addition to or reconstruction, replacement, or improvement of that property, that is used, constructed, acquired, or installed wholly or partly to meet or exceed rules or regulations adopted by any environmental protection agency of the United States, this state, or a political subdivision of this state for the prevention, monitoring, control, or reduction of air, water, or land pollution.

*Id.* § 11.31(b). However, the Legislature limited this definition somewhat by providing that property used in "manufactur[ing] or produc[ing] a product or provid[ing] a service that prevents, monitors, controls, or reduces air, water, or land pollution," such as a landfill, did not, for that reason alone, qualify for the exemption. *See id.* § 11.31(a).[4] Property that meets the statutory definition and qualifies for the exemption is termed, as shorthand, "pollution control property" within section 11.31. *See id.* § 11.31(c), (f), (h), (i).

In addition to creating this tax exemption for pollution-control property in tax code section 11.31, the Legislature also established a two-stage process for administering the exemption. In the first stage, a person desiring to obtain the exemption for particular property must apply for a determination from TCEQ's executive director (commonly termed a "use determination"[5]) that

---

[4] The Legislature also excluded from the exemption property used for residential purposes, or for recreational, park, or scenic uses as defined in tax code section 23.81. *See* Tex. Tax Code Ann. § 11.31(a) (West Supp. 2011).

[5] *See* 30 Tex. Admin. Code § 17.2(11) (2012) (Tex. Comm'n on Envtl. Quality, Definitions) (defining "use determination" as a "finding, either positive or negative, by the executive director that

3

the property "is used wholly or partly as a facility, device, or method for the control of air, water, or land pollution"—i.e., the property is pollution-control property eligible for the exemption. *See id.* § 11.31(c), (d); *cf.* § 11.31(a), (b) (statutory definition). The applicant must detail, inter alia, "the proportion of the installation that is pollution control property" and, if the property is not wholly pollution-control property, "such financial or other data as the executive director requires by rule for the determination of the proportion of the installation that is pollution control property." *Id.* § 11.31(c). Upon such application, the executive director must determine "whether the facility, device, or method is used wholly or partly to control pollution and, if applicable, the proportion of the property that is pollution control property." *See id.* § 11.31(d).

The executive director's use determination may be "appealed" to TCEQ commissioners. *See id.* § 11.31(e). The commissioners must consider the appeal at their next regularly scheduled meeting and either affirm the use determination or remand it for re-determination. *See id.* Such an appeal "is not a contested case" for purposes of the Administrative Procedures Act. *See id.*[6] TCEQ's order in such a proceeding may be challenged through a suit for judicial review under the general authorization in section 5.351 of the water code, *see* Tex. Water Code Ann. §§ 5.351, .354 (West 2008), with the district court's judgment being subject to the appellate process as with "other civil cases in which the district court has original jurisdiction." *Id.* § 5.355 (West 2008).

---

the property is used wholly or partially for pollution control purposes and listing the percentage of the property that is determined to be used for pollution control").

[6] The Administrative Procedure Act (APA) is codified at Tex. Gov't Code Ann. §§ 2001.001–.902 (West 2008).

4

If an applicant succeeds in obtaining a final use determination that the property is wholly or partly pollution-control property (termed a "positive" use determination[7]), the applicant can then apply for the exemption with the local appraisal district where the property is located. *See* Tex. Tax Code Ann. § 11.31(i); *see also id.* § 11.43 (setting forth application requirements). The district court must accept the TCEQ executive director's positive use determination as "conclusive evidence" that the property (or, if applicable, the proportion of the property that the executive director found to be pollution-control property) qualifies for the exemption. *See id.* § 11.31(i); *see also id.* § 11.31(d).

### The 2002 rule amendments

In 2001 amendments to section 11.31, the Legislature mandated that TCEQ promulgate new rules clarifying and refining the standards the executive director employed when deciding use-determination applications. *See* Act of May 22, 2001, 77th Leg., R.S., ch. 881, § 1, 2001 Tex. Gen. Laws 1774, 1775 (codified at Tex. Tax Code Ann. § 11.31(g)). These rules, the Legislature specifically required, "must . . . establish specific standards for considering applications," "ensure that determinations are equal and uniform," and—of particular significance to this appeal—"allow for determinations that distinguish the proportion of property that is used to control, monitor, prevent, or reduce pollution from the proportion of property that is used to produce goods or services." *See id.* (codified at Tex. Tax Code Ann. § 11.31(g)). With this, the Legislature added an express prohibition barring the executive director from granting any positive use determination

---

[7] *See* 30 Tex. Admin. Code § 17.2(11).

unless the property complied with those "standards established under rules adopted under this section." *Id.* (codified at Tex. Tax Code Ann. § 11.31(h)).

In recognizing—and requiring TCEQ to make—a distinction between "property that is used to control, monitor, prevent, or reduce pollution" (i.e., pollution-control property) and "property that is used to produce goods and services," the Legislature drew a conceptual line similar to one suggested by the Attorney General in an opinion he had issued a few weeks earlier construing tax code section 11.31. *See* Tex. Atty Gen. Op. No. JC-0372 (2001). Opinion JC-0372 responded to a request from TCEQ's chairman inquiring, in part, whether the pollution-control property exemption applied to equipment used to make a product that limits pollution through its design (he cited the example of a boiler constructed with technology that achieves more complete combustion and, in turn, lower emissions), as opposed to pollution-control equipment that is "added on" to production equipment (e.g., controls at the end of the production process, like scrubbers). *See id.* at 3–4. While suggesting that "an add-on device" would be "wholly" pollution-control property and thus qualify for an exemption for the total value of that property, the Attorney General, construing section 11.31's definition of pollution-control property and its provisions relating to partial exemptions, reasoned that "property that serves both a production and a pollution-reduction purpose[] is not entitled to a tax exemption on the total value of the property," but only a partial exemption corresponding to the "portion of property that actually controls pollution." *See id.* at 6–7. The Attorney General concluded by suggesting that "[t]he legislature may want to provide [TCEQ] with additional guidance regarding the proper criteria for assessing what portion of property actually controls pollution," further observing that the legislation that later became the 2001 amendments to 11.31 was already under consideration. *See id.* at 7 n.4.

In response to the Legislature's mandate, TCEQ made sweeping changes to its rules concerning use applications, which were (and still are) codified in chapter 17 of Texas Administrative Code title 30. *See* 26 Tex. Reg. 7420 (2001), *adopted by* 27 Tex. Reg. 185 (2002) (codified at 30 Tex. Admin. Code §§ 17.1–.25) (2002) ("2002 Rules"). The 2002 rules prohibited the executive director from determining that property is pollution-control property unless (1) the property was "used, constructed, acquired, or installed wholly or partly to meet or exceed laws, rules, or regulations adopted by any environmental protection agency of the United States, Texas, or a political subdivision of Texas, for the prevention, monitoring, control, or reduction or air, water, or land pollution"—i.e., it met the statutory definition of pollution-control property[8]—*and* (2) "the requirements of § 17.15 and § 17.17 of this title (relating to Review Standards and Partial Determination) have been met." *See* 2002 Rules § 17.4(d).

Section 17.15 of the 2002 Rules, in turn, required the executive director to apply standards set forth in a "Decision Flow Chart" when deciding use applications. *See id*. § 17.15 (flow chart located at 27 Tex. Reg. at 303). The Decision Flow Chart prescribed three sets of inquiries with respect to each piece of property for which the exemption was claimed. First, the executive director was to consider whether the installation of the equipment or process in question allowed the applicant to meet or exceed a specific, identifiable environmental law or regulation. *See id*. (flow chart & n.3). If he found in the affirmative, the executive director next considered whether the equipment or process provided an identifiable environmental benefit "at the site where it is installed." *See id*. (flow chart & n.4). If this second question was answered in the affirmative, the

---

[8] *See* Tex. Tax Code Ann. § 11.31(a), (b). The rule similarly tracked section 11.31's exclusions and limitations. *See* 2002 Rules § 17.4(a); *see also id.* § 17.6.

7

property was considered "eligible" for a positive use determination, and the issue then became the proportion of the property that was to be considered pollution-control property. *See id.*

To ascertain the proportion of the property that was pollution-control property, the Decision Flow Chart and other rules prescribed three alternative analytical tracks or "tiers." Under "Tier I," the applicable proportion was to be determined by referring to a "predetermined equipment list" (PDL), a listing of generic property categories and types for which the executive director had previously determined an applicable percentage of pollution-control use. *See id*. §§ 17.2(9), (11) (defining "predetermined equipment list" and "Tier I" respectively), 17.15 (flow chart). If the property appeared on the PDL or was necessary for the installation or operation of property listed there, the executive director would grant a positive use determination for the property, with the applicable percentage of use as the PDL prescribed. *See id.* § 17.2(11), 17.15 (flow chart). If the property did not appear on the PDL, the application was to be analyzed under either "Tier II," which inquired whether or not the property was wholly (100%) pollution-control property, or "Tier III," which assumed that the property was only partially pollution-control property and focused on ascertaining the appropriate percentage of use. *See id*. § 17.2(7), (12), (13) (defining "partial determination," "Tier II," and "Tier III" respectively), 17.15 (flow chart). Rule 17.17 governed Tier III determinations, also termed "partial determinations." *See id*. § 17.2(7), 17.17.

Rule 17.17 required the executive director to determine the "creditable partial percentage for a property or project which is not used wholly for pollution control" through a series of calculations derived from cost accounting principles. *See id*. § 17.17(b); *see also id*. § 17.2(4) (defining "cost analysis procedure"). Simply described, the calculations sought to identify the percentage of the property's total capital costs that were attributable to the property's pollution-

8

control feature by (1) comparing the total capital costs to the cost of comparable equipment without the pollution-control feature, and (2) adjusting downward for (a) any increases in productive capacity attributable to the new property and (b) the value of any waste byproducts that could be reused or recycled due to the new pollution-control feature. *See id.* § 17.17 (referenced charts located at 27 Tex. Reg. at 305–06 ); *see also id.* § 17.2(1), (2), (3), (10) (defining "byproduct," "capital cost new," "capital cost old," and "production capacity factor" respectively).[9]

The 2002 Rules likewise imposed procedural demands upon applicants that corresponded to the analytical tier under which the use determination was being sought. An applicant could file a "Tier I" application for a determination based on the PDL, or a "Tier II" application seeking to demonstrate that the property was wholly (100%) pollution-control property, and otherwise would be required to file a "Tier III" application seeking a partial determination. *See id.* § 17.2(11)–(13), 17.17(a). Tier III applications were the most complex, with applicants required to supply "a worksheet showing the calculation of the Cost Analysis Procedure, § 17.17

---

[9] The 2002 Rules prescribed the following formula to determine the creditable partial percentage for a property or project that is not used wholly for pollution control:

$$\frac{\left[(productionCapacityFactor \times CapitalCostNew) - CapitalCostOld - Byproduct\right]}{CapitalCostNew} \times 100$$

*See* 2002 Rules § 17.17(b). "Byproduct" in the above formula is determined as follows:

$$BP = \sum_{t=1}^{n} \frac{\left[(ByproductValue) - (Storage\& \ Transport)\right]_t}{(1 + InterestRate)^t}$$

*See id.* § 17.17(c).

of this chapter (relating to Partial Determination), and explaining each of the variables." *See id.* § 17.10(d)(5). The rules likewise imposed filing fees corresponding to the relative complexity and resource-intensiveness of the work the application demanded of TCEQ's staff, with Tier I applications requiring the lowest application fee, Tier III applications the highest, and Tier II applications in between. *See id.* § 17.20(a).

### *The 2008 rule amendments*

Although TCEQ's 2002 Rules required the executive director to establish the PDL and made it an integral part of the percentage-of-use analysis, *see id.* §§ 17.2(9), (11), 17.4(c), 17.15, the agency did not include the PDL itself within those rules. Instead, TCEQ styled the PDL as an "appendix" to a "Technical Guidelines Manual" that the agency published to give guidance to use-determination applicants. *See* 19 Tex. Reg. 7793, 7794–96 (Feb. 4, 1994) (describing manual and explaining that the PDL would be kept separate as an appendix because of the need to continually revise the PDL "independent of the manual"). The agency justified this approach as warranted by the need for flexibility in making revisions to the PDL as staff found appropriate "without the formality of rulemaking." *See id.* at 7796.

This changed, however, after the Legislature amended tax code section 11.31 in 2007 to require TCEQ to promulgate rules establishing "a nonexclusive list of facilities, devices, or methods for the control of air, water, or land pollution" and update it at least once every three years. *See* Act of May 28, 2007, 80th Leg., R.S., ch. 1277, § 4, 2007 Tex. Gen. Laws 4261, 4264 (codified at Tex. Tax Code Ann. § 11.31(k), (*l*)). TCEQ responded to this and other mandates in the legislation by promulgating rule amendments that took effect on February 7, 2008. *See* 32 Tex. Reg.

10

6985 (2007), *adopted by* 33 Tex. Reg. 932 (2008) (codified at 30 Tex. Admin. Code §§ 17.1–.20) (2008) ("2008 Rules").[10] The amendments' chief impact relevant to this case was to replace the former PDL with "Part A" of a new and slightly different "Equipment and Categories List" (ECL) that was incorporated into the rules themselves. *See* 2008 Rules § 17.2(7) (defining "Equipment and Categories List"), 17.14 (describing "Equipment Categories List).[11]

**Mont Belvieu seeks a use determination**

Appellant Mont Belvieu is in the business of storing natural gas liquids in underground salt dome caverns. To remove gases from the storage caverns, Mont Belvieu pumps in brine—heavily salted water—to displace the gases. Conversely, when Mont Belvieu desires to pump gases into the caverns, brine must be removed. In recent decades, Mont Belvieu and affiliated entities have constructed large surface impoundments or "ponds" at their storage facilities to retain displaced brine for future reuse. Such ponds fall within the definition of "brine pits" that are regulated by Texas Railroad Commission to ensure that, among other concerns, brine does not discharge into and pollute surface or subsurface waters. *See generally* 16 Tex. Admin. Code § 3.8(d)(8) (2012) (Tex. Railroad Comm'n, Water Protection) ("Rule 8"); *see also id.* § 3.8(a)(2) (defining "brine pit").

---

[10] TCEQ made further amendments to its use-determination rule in 2010, but these are not material to our analysis. *See* 35 Tex. Reg. 6255 (2010), *adopted* 35 Tex. Reg. 10964 (2010) (codified at 30 Tex. Admin. Code §§ 17.1–.25).

[11] The other portion of the ECL, "Part B," consisted of certain categories of pollution-control equipment that the Legislature's 2007 amendments required TCEQ to include in the ECL. *See* Tex. Tax Code Ann. § 11.31(k); 2008 Rules § 17.14(a).

Mont Belvieu maintains that its brine ponds and related piping, pumps, and equipment qualify as 100% pollution-control property, reasoning that these facilities represent an environmentally preferable alternative to their other principal option for handling displaced brine—disposing of it through injection wells, *see* 16 Tex. Admin. Code § 3.9 (2012) (Tex. Railroad Comm'n, Disposal Wells), a method that would also necessitate that the company consume large quantities of fresh water to create new brine when needed. As if echoing this view, the PDL (i.e., the list of predetermined pollution-control property categories under the 2002 Rules) listed "Brine Storage Ponds"—including not only the excavation, but liners, pumps, and other "ancillary equipment"—as 100% pollution-control property:

| No. | Media | Equipment | Description | Percent |
|---|---|---|---|---|
| S-20 | Land/Water | Surface Impoundments and Ancillary Equipment (Including Brine Storage Ponds) | Excavation ponds, clay and synthetic liners, leak detection systems, leachate collection and treatment equipment, monitor well, pumps, etc. | 100% |

2002 Rules § 17.14(a) (table at S-20). And Mont Belvieu or its affiliates successfully obtained at least five 100% positive use determinations for brine-pond systems between 1997 and 2007, including a 2007 Tier I determination for two ponds at its "East Storage" facility in Chambers County.

On February 12, 2008—five days after the 2008 Rules took effect and replaced the PDL with the ECL—Mont Belvieu submitted a Tier I application seeking a 100% positive use

12

determination for a $23 million brine storage pond system at its "North Storage" facility in Chambers County. The application described the project and its anticipated environmental benefits as follows:

> This Project [will] consist of one 4.0 million barrel HDPE [high-density polyethylene] double lined brine pond, instrumentation, pond piping, electrical substation and associated equipment. The brine pond will accomplish two significant purposes, waste minimization and prevention of salt water intrusion into inland waters. Also, by recycling brine, rather than using fresh water which would become brine in daily operation of the cavern system, the total quantity of waste generated will be significantly reduced by constructing this brine pond. The current scope of this project includes the construction of one 35ft X 70ft concrete pump pit, and the installation of one 600 HP tra[n]sfer pump. Also included is 3,500['] of 30" HDPE piping from the new pond to North St[ora]ge . . . .

Mont Belvieu claimed that the project's installation allowed it to meet or exceed 16 Tex. Admin. Code § 3.8—i.e., Rule 8, the Railroad Commission rule regulating "brine pits." It cited category S-20 as the basis for a Tier I determination, as had the 2007 Tier I application for the East Storage brine ponds. However, category S-20 had been changed in the new ECL:

| No. | Media | Equipment | Description | Percent |
|-----|-------|-----------|-------------|---------|
| S-20 | Land/Water | Surface Impoundments and Ancillary Equipment (Including Brine *Disposal* Ponds) | Excavation ponds, clay and synthetic liners, leak detection systems, leachate collection and treatment equipment, monitor well, pumps, etc. | 100% |

2008 Rules § 17.14(a) (table at S-20) (emphasis added).

This time, in what Mont Belvieu characterizes as a stunning about-face, TCEQ's executive director issued a negative use determination for the brine-pond system, explaining that "[t]he equipment is considered to be production equipment and not pollution control property."

13

Mont Belvieu appealed the negative use determination to TCEQ commissioners. Mont Belvieu, the executive director, and the Office of Public Interest Counsel each submitted briefing,[12] and Mont Belvieu additionally submitted evidence attempting to demonstrate that the executive director had previously issued 100% positive use determinations for several similar or identical brine-pond projects. In his briefing, the executive director urged the commissioners to affirm his negative use determination because (1) brine storage ponds were no longer included in category S-20 and were thus no longer eligible on that basis for a Tier I determination; (2) the North Storage brine-pond system was used to manage the level of gases in the storage caverns and was thus considered production equipment; and (3) the project and equipment identified in Mont Belvieu's application—the concrete pump pit, transfer pump, and piping to and from the brine pond—similarly failed the requirement that it provide an environmental benefit at the site of installation because they merely moved brine into and out of the caverns. On the other hand, the executive director acknowledged that certain components of the brine-pond system "installed to prevent contamination of surface or subsurface water in the state, such as synthetic liner, leak-detection systems, and monitoring equipment may qualify for [the] exemption." Nonetheless, he insisted that any such relief was unavailable in the procedural context of Mont Belvieu's pending application, which sought a Tier I determination for the entire brine-pond system.

The commissioners considered Mont Belvieu's appeal during one of their regular public meetings and afforded counsel for Mont Belvieu and the executive director five minutes each to present oral argument. During this portion of the meeting, two exchanges occurred between

---

[12] The local appraisal district did not file any briefing.

Mont Belvieu and the commissioners that have significance to this appeal. First, Mont Belvieu acknowledged that, as the executive director had argued, it used the North Storage brine-pond system in producing its gas-storage services—i.e., the system was, at least in part, "production property" and not exclusively pollution-control property. Second, the commissioners, echoing the executive director's suggestions that certain components of the system would likely qualify as pollution-control property, inquired whether Mont Belvieu desired a remand so that it could submit an application limited to or otherwise distinguishing the system's pollution-control components or features. Mont Belvieu declined this invitation, steadfastly insisting that it was entitled to a 100% positive use determination for the entire brine-pond system. Immediately following the latter exchange, TCEQ commissioners voted unanimously to affirm the executive director, "having concluded that the Executive Director's Determination was in accordance with the applicable statutes and rules."

**Proceedings in district court**

Mont Belvieu sued TCEQ and its executive director (collectively "TCEQ" with reference to this litigation) seeking to challenge the agency's final order. As authorized by water code section 5.351, Mont Belvieu sought judicial review of the order, asserting that its North Storage brine-pond system qualified for a 100% positive use determination and that TCEQ's contrary decision was arbitrary and capricious. Mont Belvieu also asserted claims for declaratory relief under section 2001.038 of the APA[13] and the Uniform Declaratory Judgments Act (UDJA)[14] challenging the validity and TCEQ's construction of tax code section 11.31 and accompanying regulations.

---

[13] *See* Tex. Gov't Code Ann. § 2001.038.

[14] *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001–.011 (West 2008).

Specifically, Mont Belvieu sought declarations that: (1) TCEQ's construction of tax code section 11.31 and accompanying regulations in relation to the North Storage brine-pond system "ignore the plain terms of the statute and engraft additional requirements," causing the agency to render "ultra vires decisions beyond the scope of the agency's authority"; (2) TCEQ's "decision to treat Mont Belvieu differently from virtually identical, prior applicants" violated the company's due-process and equal-protection rights under the federal and state constitutions; (3) TCEQ's denial of the pollution-control exemption through administrative means and any judicial review limited to the substantial-evidence standard violated constitutional due-process, equal-protection, open-courts, and jury-trial protections; (4) tax code section 11.31 was an unconstitutional delegation of legislative authority to TCEQ; and (5) TCEQ's application of its administrative rules had caused Mont Belvieu's property taxes to be "excessive and unlawful."

Mont Belvieu propounded discovery requests on TCEQ. These requests consisted of contention interrogatories, requests for production, and requests for admission inquiring into TCEQ's legal and factual bases for determining that the North Storage brine-pond system was not 100% pollution-control property and how that determination compared to the agency's prior use determinations involving other brine ponds. Mont Belvieu also requested admissions to the effect that its North Storage brine-pond system had environmentally beneficial effects. TCEQ sought a protective order, arguing principally that the requests were not reasonably calculated to lead to the discovery of admissible evidence because judicial review was confined to the agency record. Mont Belvieu moved to compel.

While these discovery-related motions remained pending, Mont Belvieu filed a motion for partial summary judgment on its judicial-review claim. Mont Belvieu sought to establish

16

that TCEQ had acted arbitrarily and capriciously based on evidence purporting to demonstrate conclusively that the agency had previously granted 100% positive use determinations on projects similar or identical to its North Storage brine-pond system. Relatedly, Mont Belvieu asserted several summary-judgment grounds attempting to demonstrate that TCEQ's intervening change from the PDL to the ECL did not provide legal support or justification for treating the North Storage brine-pond system differently. Specifically, Mont Belvieu urged that, as a matter of law, the applicability of the pollution-control property exemption was governed by the rules in effect on January 1, 2008—i.e., the PDL—and that TCEQ's application of the ECL instead was unconstitutionally retroactive. In the event the ECL did apply, Mont Belvieu further asserted that the North Storage brine-pond system still came within category S-20, and thus qualified for a Tier I 100% positive use determination, because there was no substantive distinction between "brine storage ponds" and "brine disposal ponds." And even if there were such a difference, Mont Belvieu urged further in the alternative, S-20's reference to "brine disposal ponds" was merely illustrative and non-exclusive, and the system was still a "surface impoundment" that fit within the categorical description.

In addition to responding to Mont Belvieu's summary-judgment motion, TCEQ filed a cross-motion for partial summary judgment that Mont Belvieu take nothing on its judicial-review claim. Among its grounds, TCEQ asserted that, contrary to Mont Belvieu's contentions, any allegedly "unequal" treatment of the North Storage brine-pond system was justified by the new ECL and that its application of the new list was not retroactive, much less unconstitutionally so. As additional grounds, TCEQ relied on the now-undisputed fact that the system was, at least in part, production property, urging that this fact negated the possibility of the 100% positive use determination Mont Belvieu had sought and that, similarly, various system components merely

17

served production purposes and did not provide an environmental benefit at the site. Although reiterating its prior acknowledgments that certain system components might qualify for the exemption, TCEQ likewise urged again that any such relief was unavailable under the procedural posture of Mont Belvieu's Tier I application.

Hearings were held on both the summary-judgment motions and the pending discovery motions. Following both hearings, the district court granted TCEQ's motion for protective order and denied Mont Belvieu's motion to compel.[15] A few days later, the district court granted TCEQ's cross-motion for partial summary judgment and denied Mont Belvieu's motion. The district court's order did not state the specific grounds on which it relied. Subsequently, and expressly without conceding the merits of the district court's prior rulings, Mont Belvieu filed a notice of partial non-suit as to its remaining claims in order to make the district court's summary-judgment order final. Mont Belvieu identified the "Undecided Claims" as its "due process and equal protection claims, ultra vires claim, claim that TCEQ denied Mont Belvieu's access to open courts or trial by jury, claim that Tax Code section 11.31 is an unconstitutional delegation of legislative authority, and claim that the subject taxes are excessive and unlawful." The district court then signed a final judgment incorporating its prior rulings and the nonsuit. This appeal followed.

**ANALYSIS**

Mont Belvieu brings two issues on appeal. In the first, Mont Belvieu urges that the district court erred in granting TCEQ's summary-judgment motion and denying its own. In the

---

[15] Although the Honorable Tim Sulak ultimately signed the final judgment, as reflected in our caption, the Honorable Lora Livingston heard and ruled on the discovery motions and the Honorable Stephen Yelenosky ruled on the partial summary judgment motions.

18

second, Mont Belvieu argues that the district court abused its discretion in denying Mont Belvieu's motion to compel discovery and granting TCEQ a protective order.

Before turning to these issues, we emphasize some significant aspects of the procedural posture in which they are presented to us. Most prominently, when asserting its exemption claim before TCEQ, Mont Belvieu opted to stand or fall based on a claimed entitlement to a *100%* positive use determination for its North Storage brine-pond system—an all-or-nothing claim that the system is wholly pollution-control property—and in particular a Tier I determination based on category S-20 of the relevant listing of predetermined pollution-control property. Consequently, the merits of Mont Belvieu's underlying judicial-review claim turn on whether TCEQ acted arbitrarily or capriciously in determining that the brine-pond system was not in category S-20 of that listing and thereby failed to qualify for a Tier I determination.[16] "An administrative agency is said to act arbitrarily or capriciously where, among other things, it fails to consider a factor the Legislature has directed it to consider, considers an irrelevant factor, or considered relevant factors but still reaches a completely unreasonable result." *City of Waco v. Texas Comm'n on Envtl. Quality*, 346 S.W.3d 781, 819 (Tex. App.—Austin 2011, pet. denied) (citing *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 184 (Tex. 1994)).

Additionally, while Mont Belvieu initially asserted claims for declaratory relief more broadly challenging the administrative and statutory framework within which TCEQ made this determination, it ultimately non-suited all of these claims except to the extent they were implicated

---

[16] Although TCEQ advocated a substantial-evidence standard below, at this juncture the parties agree that the arbitrary-and-capricious standard governs review of TCEQ's order in a non-contested-case proceeding. *See City of Waco v. Texas Comm'n on Envtl. Quality*, 346 S.W.3d 781, 815–19 (Tex. App.—Austin 2011, pet. denied).

in the district court's summary-judgment rulings.  The sole declaratory claim that would appear to be implicated by the summary-judgment rulings is Mont Belvieu's claim that TCEQ's determination and its rules, including the ECL, are inconsistent with tax code section 11.31.

**Summary judgment**

On appeal, Mont Belvieu challenges TCEQ's entitlement to summary judgment on each of the grounds presented in TCEQ's motion and urges that it was entitled to summary judgment on each of the grounds presented in its own motion.  In essence, these competing grounds join issue as to whether the North Storage brine-pond system qualifies as wholly (100%) pollution-control property under TCEQ's rules or, if not, nonetheless qualifies under the statutory definitions such that the rules are inconsistent with the statute and invalid.  If the system did not qualify as 100% pollution-control property under either TCEQ's rules or the underlying statutory definitions, TCEQ would not, as a matter of law, have acted arbitrarily or capriciously in denying Mont Belvieu's application—rather, it would have acted arbitrarily and capriciously if it had granted it.  *See Rodriguez v. Service Lloyds Ins. Co.*, 997 S.W.2d 248, 254–55 (Tex. 1999) ("If the Commission does not follow the clear, unambiguous language of its own regulation, we reverse its action as arbitrary and capricious.").

### *Standard of review*

We review a trial court's summary-judgment rulings de novo.  *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003).  Summary judgment is proper when there are no disputed issues of material fact and the movant is entitled to judgment as a matter of law.  Tex. R. Civ. P. 166a(c).

When reviewing a summary judgment, we take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor. *Valence Operating Co.*, 164 S.W.3d at 661; *Knott*, 128 S.W.3d at 215. When parties file cross-motions for summary judgment on overlapping issues and the trial court grants one motion and denies the other, we review the summary-judgment evidence supporting both motions and determine all questions presented and preserved. *See FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000). We "should render the judgment that the trial court should have rendered." *Id.* Where, as here, the trial court does not specify any particular ground on which it relied when granting the motion, we will affirm the judgment on any ground presented in the motion that is meritorious and preserved for our review. *State Farm Fire & Cas. Co. v. S.S.*, 858 S.W.2d 374, 380 (Tex. 1993); *Pickett v. Texas Mut. Ins. Co.*, 239 S.W.3d 826, 840 (Tex. App.—Austin 2007, no pet.).

To the extent our resolution of these issues turns on construction of the tax code, we review these questions de novo. *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). Our primary objective in statutory construction is to give effect to the Legislature's intent. *See id.* We seek that intent "first and foremost" in the statutory text. *Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83, 85 (Tex. 2006). "Where text is clear, text is determinative of that intent." *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009) (op. on reh'g) (citing *Shumake*, 199 S.W.3d at 284; *Alex Sheshunoff Mgmt. Servs. v. Johnson*, 209 S.W.3d 644, 651–52 (Tex. 2006)). We consider the words in context, not in isolation. *State v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002). We rely on the plain meaning of the text, unless a different meaning is supplied by legislative definition or is apparent from context, or unless such a construction leads to absurd results. *See Entergy Gulf States, Inc.*, 282 S.W.3d at 437; *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625–26 (Tex. 2008); *see also*

Tex. Gov't Code Ann. § 311.011 (West 2005) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage," but "[w]ords and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly."). We also presume that the Legislature was aware of the background law and acted with reference to it. *See Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990). We further presume that the Legislature selected statutory words, phrases, and expressions deliberately and purposefully. *See Texas Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010); *Shook v. Walden*, 304 S.W.3d 910, 917 (Tex. App.—Austin 2010, no pet.). Our analysis of the statutory text may also be informed by the presumptions that "the entire statute is intended to be effective" and that "a just and reasonable result is intended," Tex. Gov't Code Ann. § 311.021(2), (3) (West 2005), and consideration of such matters as "the object sought to be attained," "circumstances under which the statute was enacted," legislative history, "common law or former statutory provisions, including laws on the same or similar subjects," "consequences of a particular construction," and the enactment's "title." *Id*. § 311.023(1)-(5), (7) (West 2005). However, only when the statutory text is ambiguous "do we 'resort to rules of construction or extrinsic aids.'" *Entergy Gulf States, Inc*., 282 S.W.3d at 437 (quoting *In re Estate of Nash*, 220 S.W.3d 914, 917 (Tex. 2007)).

In addition to these general principles that guide our construction of tax code section 11.31, "[s]tatutory exemptions from taxation," like the pollution-control exemption, "are subject to strict construction because they undermine equality and uniformity by placing a greater burden on some taxpaying businesses and individuals rather than placing the burden on all taxpayers equally." *North Alamo Water Supply Corp. v. Willacy Cnty. Appraisal Dist.*, 804 S.W.2d 894, 899

22

(Tex. 1991) (citing *Bullock v. National Bancshares Corp.*, 584 S.W.2d 268, 271–72 (Tex. 1979)).

All doubts are resolved against the granting of an exemption. *See id.*; *Davies v. Meyer*, 541 S.W.2d 827, 830 (Tex. 1976).

Mont Belvieu's first issue also potentially implicates principles that would require us to defer to TCEQ's construction of statutes it administers. *See Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624–25 (Tex. 2011). But these principles apply only where the statute in question is ambiguous and only to the extent that the agency's interpretation is one of those reasonable interpretations. *See id.* "Consequently, to determine whether this rule of deference applies, a reviewing court must first make a threshold determination that the statute is ambiguous and the agency's construction is reasonable—questions that turn on statutory construction and are reviewed de novo." *City of Waco*, 346 S.W.3d at 800 (citing *Texas Citizens*, 336 S.W.3d at 625). Additionally, this Court has recognized that these principles of deference may be subject to further qualifications where the subject matter is not within any specialized expertise of the agency, *see id.* (citing *Texas Citizens*, 336 S.W.3d at 630), and where "a nontechnical question of law" is involved, *see Rogers v. Texas Bd. of Architectural Exam'rs*, —S.W.3d—, No. 03–10–00182–CV, 2011 Tex. App. LEXIS 6110, at \*15 (Tex. App.—Austin Aug. 3, 2011, no pet. h.) (citing *Rylander v. Fisher Controls Int'l, Inc.*, 45 S.W.3d 291, 302 (Tex. App.—Austin 2001, no pet.)).

To the extent our analysis turns on TCEQ's construction of the rules themselves, we defer to the agency's interpretation of its own rules unless that interpretation is plainly erroneous or inconsistent with the text of the rule or underlying statute. *See Public Util. Comm'n v. Gulf States Utils. Co.*, 809 S.W.2d 201, 207 (Tex. 1991); *Tennessee Gas Pipeline Co. v. Rylander*, 80 S.W.3d

23

200, 203 (Tex. App.—Austin 2002, pet. denied). We construe administrative rules in the same manner as statutes because they have the force and effect of statutes. *Rodriguez*, 997 S.W.2d at 254.

### *Pollution-control vs. production property*

Mont Belvieu's core assertion on appeal is that its North Storage brine-pond system qualifies as 100% pollution-control property under the definition in tax code section 11.31 and that it matters not under that definition whether the facility might also be considered production property. To the extent TCEQ's rules would require a contrary conclusion, Mont Belvieu further suggests, they contradict the statutory definition and are invalid.

Mont Belvieu emphasizes the text of subsections (a) and (b) of tax code section 11.31. Subsection (a), as previously noted, states that "[a] person is entitled to an exemption from taxation of all or part of real and personal property that the person owns and that is used wholly or partly as a facility, device, or method for the control of air, water, or land pollution," while subsection (b) defines "facility, device, or method for the control of air, water, or land pollution." *See* Tex. Tax Code Ann. § 11.31(a), (b). With reference to subsection (b), Mont Belvieu argues that its brine-pond system is (1) an "improvement" to real property, as well as a "structure," "installation," "excavation," and "device;" (2) that is "used, constructed, acquired, or installed wholly or partly to meet or exceed [environmental] rules or regulations"—the Railroad Commission's Rule 8—and (3) Rule 8 was adopted by the Railroad Commission at least in part "for the prevention, monitoring, control, or reduction of air, water, or land pollution." *See id.* § 11.31(b). And, Mont Belvieu reasons, because its brine-pond system was thus unquestionably "part of real . . . property that [it]

24

owns and that is used wholly or partly" as such a "facility, device, or method," subsection (a) "entitle[s] [it] to an exemption from taxation." *See id.* § 11.31(a).

Mont Belvieu acknowledges that its brine-pond system is part of the process by which it produces its gas-storage services for customers and that other subsections within section 11.31 contemplate—indeed require—that if property is not "wholly" used for pollution control, TCEQ will limit any positive use determination to the proportion of the property that is. *See id.* § 11.31(c)(3) (use-determination applicants must detail "the proportion of the installation that is pollution control property" and, "[i]f the installation includes property that is not used wholly for the control of air, water, or land pollution, the [applicant] shall also present such financial or other data as the executive director requires by rule for the determination of the proportion of the installation that is pollution control property"), (d) (executive director shall make "determination of whether the facility, device, or method is used wholly or partly to control pollution and, if applicable, the proportion of the property that is pollution control property"), (g)(3) (rules must "allow for determinations that distinguish the proportion of property that is used to control, monitor, prevent, or reduce pollution from the proportion of property that is used to produce goods and services"). But, Mont Belvieu insists, its brine-pond system *is* "wholly" pollution-control property as defined in subsections (a) and (b) because the system and all of its components collectively enable it to recycle brine rather than disposing of it, an alternative that also conserves fresh water that otherwise would be consumed in producing brine anew. In its view, nothing in section 11.31 precludes property from being considered "wholly" pollution-control property while also concurrently having a role in producing goods and services. "At its logical extreme," Mont Belvieu suggests, "all property has a business purpose," including property like disposal wells that TCEQ

considers to be 100% pollution-control property, and that "[i]f the Legislature had intended to define pollution control property as any method 'used solely and exclusively for pollution control and not a concurrent business purpose,'" it would have said so in the statute, yet did not. In imposing such a limitation here, Mont Belvieu urges, TCEQ has misconstrued and improperly added elements to the definition of pollution-control property that the Legislature has actually chosen.

Mont Belvieu's reasoning overlooks the significance of subsection (g)(3) of section 11.31. That provision, as previously explained, was part of the Legislature's 2001 amendments mandating that TCEQ promulgate, and comply with, rules imposing greater clarity and consistency in use determinations. *See* Act of May 22, 2001, 77th Leg., R.S., ch. 881, § 1, 2001 Tex. Gen. Laws 1774, 1775 (codified at Tex. Tax Code Ann. § 11.31(g), (h)). And in subsection (g)(3), the Legislature in particular mandated that the new rules "allow for determinations that distinguish the proportion of property that is used to control, monitor, prevent, or reduce pollution [i.e., pollution-control property] from the proportion of property that is used to produce goods or services." *Id*. § 11.31(g). By requiring that TCEQ "*distinguish* the proportion of property that is used to control, monitor, prevent, or reduce pollution [i.e., pollution-control property] *from* the proportion of property that is used to produce goods or services," the Legislature manifested its understanding and intent that pollution-control property—property qualifying for the tax exemption—is, by definition, distinct from "property that is used to produce goods and services." *See id.* Further, in the context of a statute addressing an exemption from ad valorem taxation, subsection (g)(3) means that TCEQ must distinguish the proportion of the property's value that is attributable to a pollution-control feature from that attributable to its capacity to produce goods and services, thereby reflecting legislative intent to limit the pollution-control property exemption solely

26

to capital investment made to comply with state or federal environmental regulations that does not yield productive benefits and would thus otherwise be irrational economically. *See id.* § 11.31(g)(3). In fact, TCEQ refers us to anecdotal legislative history that, while not controlling, tends to confirm that this was the purpose of the pollution-control property exemption from its inception.[17]

These limitations and qualifications reflected in subsection (g)(3) in turn inform our construction of subsections (a) and (b)'s definition of pollution-control property. *See State v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002) (noting that courts must consider the words of a statute in context, not in isolation). And it follows from these limitations and qualifications that property cannot qualify as 100% pollution-control property if any portion of its value is attributable to its capacity to produce goods and services. By acknowledging that its North Storage brine-pond system was part of its production process, Mont Belvieu in essence conceded that at least some portion of the property's value was attributable to its productive capacity, and it was not arbitrary or capricious for TCEQ to determine as much. Consequently, Mont Belvieu's brine-pond system cannot, by definition, be wholly (100%) pollution-control property. Thus, TCEQ's rejection of Mont Belvieu's

---

[17] *See* Hearings on H.B. 1920 and H.J.R. 86 Before the House Comm. on Ways & Means, 73d Leg., R.S., (Mar. 24, 1993) (testimony of Harry Whitworth) (testifying that "the equipment that we're talking about here today does not produce a penny of revenue. It's in there simply for the welfare[,] as we see it, [of] the general population."); *see id.* (statement of Representative Steve Wolens) (explaining that if companies "are going to be forced to buy stuff because the government is insisting that they do it, don't hit them another time by paying the ad valorems on something they don't really [] want anyway"); *see* Hearings on Tex. H.B. 1920 and H.J.R. 86 Before the Senate Comm. on Intergovernmental Relations, 73d Leg., R.S. (Apr. 28, 1993) (testimony of Bill Allaway) (explaining to Senator John Whitmire, in response to concern that a landfill operator would be wholly exempt from property taxation, that property eligible for exemption "is property that prevents the business . . . from polluting, not the property that they use to conduct their business").

Tier I application for a 100% positive use determination was consistent with tax code section 11.31, as were any rules that required that decision.

### *Rules*

Without textual support for its exemption claim in tax code section 11.31 itself, Mont Belvieu must retreat to urging that the applicable TCEQ rules nonetheless classified its brine-pond system as 100% pollution-control property. Bringing forward grounds raised in its summary-judgment motion and response, Mont Belvieu first seeks to establish that TCEQ could not validly apply the ECL to its exemption claim but was instead required to use the PDL. Mont Belvieu suggests that TCEQ acted arbitrarily and capriciously in changing category S-20's reference to "brine storage ponds" in the PDL to the ECL's reference to "brine disposal ponds." As discussed previously, however, the tax code reflects the Legislature's intent that TCEQ distinguish pollution-control property—property qualifying for the tax exemption—from "property that is used to produce goods and services." *See* Tex. Tax Code Ann. § 11.31(g). Given that statutory directive, a TCEQ rule that would allow storage-only brine ponds, which Mont Belvieu acknowledges are part of the production process, to qualify as 100% pollution-control property would exceed the statutory scope of the exemption. As such, it was not arbitrary or capricious for TCEQ to change its rules to be consistent with the statute and its legislative intent.

Mont Belvieu also contends that, as a matter of law, its eligibility for the pollution-control exemption is governed by the facts and law that existed on January 1, 2008, such that TCEQ was bound to apply the PDL rather than the ECL, which did not take effect until February 7, 2008. Section 11.42 provides that, as a general rule, "eligibility for and amount of an exemption authorized

by this chapter for any tax year are determined by a claimant's qualifications on January 1." Tex. Tax Code Ann. § 11.42(a) (West Supp. 2011). However, while the effect of this requirement is to "freeze" the material facts as they existed on January 1, 2008, it does not address what rules may apply to construing those material facts—i.e., to grant or not grant the exemption—or, in fact, what law may exist to levy such a tax. *See Cadena v. State*, 185 S.W. 367, 368 (Tex. Civ. App.—San Antonio 1916, writ ref'd) (holding that taxes on property owned in January may be levied at any time during the calendar year without violating the prohibition against retroactive laws).

Finally, Mont Belvieu argues that TCEQ's application of the ECL in lieu of the PDL was unconstitutionally retroactive. *See* Tex. Const. art. I, § 16 ("No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made."). We disagree. Under article I, section 16, retroactive application of a law is unconstitutional only when it destroys or impairs vested rights. *See Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 219 (Tex. 2002); *Corpus Christi People's Baptist Church, Inc. v. Nueces Cnty. Appraisal Dist.*, 904 S.W.2d 621, 626 (Tex. 1995); *General Dynamics Corp. v. Sharp*, 919 S.W.2d 861, 866–67 (Tex. App.—Austin 1996, writ denied); *see also Grocers Supply Co. v. Sharp*, 978 S.W.2d 638, 643 (Tex. App.—Austin 1998, pet. denied) (applying same principle to administrative rules). But taxpayers do not have a vested interest or right in the method or procedure used to determine the applicability of a tax exemption. *See Ex parte Abell*, 613 S.W.2d 255, 261 (Tex. 1981) (noting that anticipated continuance of present law is not a vested right); *City of Dallas v. Trammel*, 101 S.W.2d 1009, 1012 (Tex. 1937) (holding that there is no vested right to that which constitutes a mere expectancy based upon anticipated continuance of existing law); *General Dynamics*, 919 S.W.2d at 867 (holding that "no Texas taxpayer has a vested right in the continuation of a particular

29

measurement method for the franchise tax"); *see also Ex parte Abell*, 613 S.W.2d at 262 ("When the authority granting the right has the power and discretion to take that right away, it cannot be said to be a vested right."). At best, Mont Belvieu had an expectation that its claim for the exemption might succeed in light of prior TCEQ rules and decisions. Further, it is not clear that TCEQ's rule is retroactive. "A statute is retroactive only if it operates before its effective date." "It is not retroactive merely because it draws upon antecedent facts for its operation." *General Dynamics*, 919 S.W.2d at 866.

In the event it could not avail itself of the PDL, Mont Belvieu has brought forward two arguments to the effect that it was entitled to the pollution-control exemption even under the ECL. The first is that the one-word change—i.e., from "brine *storage* ponds" to "brine *disposal* ponds"—in the description of items included in the phrase "surface impoundments" is "substantively irrelevant" because those terms are indistinguishable as they are used in the industry. Specifically, Mont Belvieu observes that TCEQ's use-determination rules require that undefined terms in the rules be interpreted using "the meanings commonly ascribed to them in the fields of pollution control or property taxation," *see* 30 Tex. Admin. Code § 17.2 (2012) (Tex. Comm'n on Envtl. Quality, Definitions), and urges that, in those fields, "storage" and "disposal" are used interchangeably when referring to surface impoundments. They point principally to the Railroad Commission's rules governing brine recycling ponds, arguing that those rules show that there is no distinction between "storage" and "disposal." *See* 16 Tex. Admin. Code § 3.8(a)(2) (2012) (Railroad Comm'n, Water Protection) (defining "brine pit" as a "[p]it used for storage of brine"), (a)(3) (defining "collecting pit" as a "[p]it used for storage of saltwater prior to disposal"); *but see id.* § 3.8(a)(13) (defining "saltwater disposal pit" as "[p]it used for disposal of produced saltwater"). They also point to the

30

Texas Natural Resource Code's definition of "saltwater disposal pit" as "a collecting pit on the surface of the ground used to *store* or evaporate oil field brines . . . ." *See* Tex. Nat. Res. Code Ann. § 91.451 (West 2011) (emphasis added). However, especially in the context of the underlying tax code provisions that we have previously construed, we cannot conclude that TCEQ's construction of its own rule to conclude that a brine storage pond used to recycle brine in a production process is not a 100% tax-exempt "brine *disposal* pond" is plainly erroneous or inconsistent with the text of the rule or the underlying statute. *See Gulf States Utils. Co.*, 809 S.W.2d at 207; *Tennessee Gas Pipeline Co.*, 80 S.W.3d at 203. As such, we defer to TCEQ's interpretation. *See Gulf States Utils. Co.*, 809 S.W.2d at 207.

Mont Belvieu's second argument is that the phrase "surface impoundment" under ECL category S-20 is broad enough to encompass Mont Belvieu's brine ponds. But even if we assume this is true, Mont Belvieu's argument necessarily presumes that its brine storage ponds are the kind of surface improvements that would be considered wholly (100%) pollution-control property because of its procedural stance that it is entitled to a 100% positive use determination rather than a partial determination—i.e., an all-or-nothing claim that the system is wholly pollution-control property. Stated another way, even if Mont Belvieu's brine-pond system qualifies as a surface impoundment under the ECL, Mont Belvieu can only prevail here if that surface impoundment is wholly pollution-control property that is not used for other purposes. *See* 33 Tex. Reg. at 933 ("Simply because a piece of equipment is on the [ECL] . . . does not mean it will receive a positive use determination."); 32 Tex. Reg. at 6979 (same). But Mont Belvieu acknowledged that its brine-pond system was production property and was not exclusively pollution-control property. Thus, for the reasons stated, we cannot say that TCEQ's interpretation of its own rules—i.e., that

31

a brine-pond system that is not used wholly (100%) for pollution control is not entitled to a 100% positive use determination—is plainly erroneous or inconsistent with the text of the rule or the underlying statute, and we must defer to its interpretation. *See Gulf States Utils. Co.*, 809 S.W.2d at 207; *Tennessee Gas Pipeline Co.*, 80 S.W.3d at 203.

Our resolution of the foregoing summary-judgment grounds establishes that, as a matter of law, Mont Belvieu's North Storage brine-pond system did not qualify as 100% pollution-control property under the applicable TCEQ rules. Although Mont Belvieu also brings forward complaints relating to TCEQ's rule requiring applicants to prove environmental benefit at the site of installation, we need not address this alternative rule-based justification for the agency's decision. *See* Tex. R. App. P. 47.1. The district court properly granted summary judgment for TCEQ. We overrule Mont Belvieu's first issue.

**Discovery**

In its second issue, Mont Belvieu contends that the district court abused its discretion in denying it discovery concerning the legal and factual bases for TCEQ's negative use determination. *See In re CSX Corp.*, 124 S.W.3d 149, 152 (Tex. 2003) ("Generally, the scope of discovery is within the trial court's discretion."). This complaint is without merit. As noted above, Mont Belvieu's claims remaining after its nonsuit were its claim for judicial review and its claim for declaratory judgment that TCEQ's determination and its rules are inconsistent with tax code section 11.31. The central issues in both these claims, as set forth in our analysis of Mont Belvieu's first issue, turned on questions of law—specifically construction of statutes and rules. There were no disputed material facts bearing on those inquiries. Thus, discovery would not have aided in the

resolution of these claims and, accordingly, we cannot say that the trial court abused its discretion in denying discovery regarding these claims. *See id.* at 151–53 (noting that discovery requests must show a reasonable expectation of obtaining information that will aid in resolution of the dispute). As to Mont Belvieu's nonsuited claims, even if we were to assume that the trial court erred in denying discovery regarding these claims, any such error was rendered harmless by Mont Belvieu's subsequent nonsuit of those claims. Accordingly, we overrule Mont Belvieu's second issue.

## CONCLUSION

Having overruled both of Mont Belvieu's issues on appeal, we affirm the district court's judgment.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Rose

Affirmed

Filed: August 3, 2012