# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-17-00712-CV

**Southern Concepts, Inc.; Volunteers of America Texas, Inc.; Knob Oak, Inc.; Silver Quail, Inc.; Community Access, Inc.; and Creative Community Care, Inc., Appellants**

**v.**

**Texas Department of Aging and Disability Services, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT NO. D-1-GN-13-000999, HONORABLE DARLENE BYRNE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellants Southern Concepts, Inc.; Volunteers of America Texas, Inc.; Knob Oak, Inc.; Silver Quail, Inc.; Community Access, Inc.; and Creative Community Care, Inc. (the Providers) appeal from the trial court's order granting the motion for summary judgment of appellee Texas Department of Aging and Disability Services (the Department) and affirming the Department's final orders.[1]  In the orders, the Department found that the Providers were liable for underpaying quality assurance fees (QAF) for the time period September 1, 2004, to December 31, 2007, following the Department's after-the-fact recalculation of the QAF that each Provider owed for that time period. *See* Tex. Health & Safety Code § 252.202 (addressing computation of quality assurance fee).  For

---

[1] In 2017, the Texas Department of Aging and Disability Services ceased to be a state agency after the transfer of its operations to the Texas Health and Human Services Commission (the Commission) was completed.  We, however, refer to appellee as the Department to be consistent with the parties' briefing.

the following reasons, we reverse the trial court's order and the Department's final orders and remand the administrative cases to the Department.[2]

## Background

### Statutory and Regulatory Framework

To give context to the parties' dispute, we begin with a brief overview of the relevant statutes and administrative rules. Chapter 252 of the Texas Health and Safety Code addresses intermediate care facilities for individuals with intellectual disabilities, and subchapter H of chapter 252 addresses the QAF that is imposed on intermediate care facilities and collected by the Department. *See* Tex. Health & Safety Code §§ 252.202 (imposing quality assurance fee on facilities), .204 ("The commission or the department at the direction of the commission shall collect the quality assurance fee."); *see generally id.* §§ 252.202–.208. The QAF owed by a particular facility is "determined using patient days and gross receipts reported to the department and covering a period of at least six months." *Id.* § 252.202(c); *see id.* §§ 252.201 (defining "gross receipts" generally to mean "money paid as compensation for services provided to residents, including client participation"), .203 (providing calculation for determining number of patient days), .204(b) (requiring facilities to file report with Department stating total patient days for month and "not later than the 30th day after the last day of the month pay the quality assurance fee").

---

[2] This appeal was consolidated with this Court's cause number 03-17-00711-CV for purposes of briefing and consideration. By opinion issued this same date, we similarly reverse the trial court's final judgment and the Department's orders in that case and remand the administrative cases to the Department.

2

In 2008, the Commission designated the Department as the administrator of the QAF program. Under the program, the Department is required to set an intermediate care facility's QAF "for each day in the amount necessary to produce annual revenues equal to an amount that is not more than six percent of the facility's total annual gross receipts in this state." *See id.* § 252.202(b). Facilities pay QAF monthly, *id.* § 252.202(a)(2), and "[t]he fee is subject to a prospective adjustment as necessary," *id.* § 252.202(b). Further the executive commissioner of the Texas Health and Human Services Commission (the Commission) is required to adopt rules for the administration of subchapter H, "including rules related to the imposition and collection of the quality assurance fee," *id.* § 252.205(a), but the commissioner "may not adopt rules granting any exceptions from the quality assurance fee," *id.* § 252.205(b).

At the heart of the parties' dispute are the Commission's rules addressing the QAF that were in effect from September 1, 2004, through December 31, 2007 (the 2004–2007 time period). *See* 1 Tex. Admin. Code §§ 352.1–.9 (2003) (Texas Health and Human Servs. Comm'n, Quality Assurance Fee for Long-Term Care Facilities); *see also* 28 Tex. Reg. 9235 (2003) (adopting amendments to rules addressing QAF, effective Oct. 29, 2003), 33 Tex. Reg. 667 (adopting amendments to rules addressing QAF, effective Feb. 3, 2008).[3] Under the rules as they existed prior to being amended in 2008, the QAF for a facility was determined as follows:

---

[3] Unless otherwise stated, citations to the Commission's rules are to the version of the rules as they existed prior to their amendment in 2008. The current version of the rules is found in sections 11.2 to 11.9 of title 40 of the Texas Administrative Code. *See* 40 Tex. Admin. Code §§ 11.2–.9 (Dep't of Aging & Disability Servs., Quality Assurance Fee).

Beginning September 1, 2003, the quality assurance fee for a facility is in the amount of six percent of each reimbursement or payment rate received, including those received from the resident, for each resident in the facility during the calendar month, provided the amount of all such quality assurance fees assessed for the facility during the 12-month period following assessment of the quality assurance fee do not exceed six percent of the facility's total annual gross receipts in Texas.

1 Tex. Admin. Code § 352.3(b) (Quality Assurance Fee Determination Methodology). At intervals of six months, the Department was required to review each intermediate care facility's QAF calculation. *Id.* § 352.3(c). Following this review, the Department was authorized to adjust a facility's liability for its QAF "to ensure that the quality assurance fee [did] not exceed six percent of annual revenue." *Id.*; *see id.* § 352.5(4) (Payment and Collection of Quality Assurance Fee) (authorizing Department to review calculation of QAF "to ensure its accuracy and instruct the facility to correct its calculation and payment"). The Department also was authorized to audit a facility's records to determine the total patient days or gross receipts, but it was prohibited from granting "any exceptions from the quality assurance fee." *Id.* § 352.6(a), (b) (Enforcement).

A facility was required to "[p]ay the amount of the quality assurance fee in accordance with the [Department's] instructions" "not later than the 30th day after the last day of the month for which the fee [was] assessed." *Id.* § 352.5(1), (2). The facility also was required to file reports of patient days and total gross receipts. *Id.* § 325.4 (Required reports) (requiring monthly patient day report and semi-annual report of "total gross receipts the facility received during the preceding 6-month period").[4] If a facility believed that its QAF had been calculated incorrectly, the

---

[4] The Department was authorized to assess a financial penalty against a facility for failing to file required reports or to pay its QAF timely. *See* 1 Tex. Admin. Code § 352.7 (Penalty). Penalties are not at issue in this appeal.

4

facility could request an informal review from the Department. *Id.* §§ 352.5(2), .8 (Informal review) (setting procedure for informal review from Department).

As to the 2008 amendments to the rules, the definition of "gross receipts" was amended to add the following sentence: "Gross receipts are defined as accrued payments and not as cash received." *Id.* § 352.2(3) (effective Feb. 3, 2008) (Definitions). The QAF also was amended to be equal to five and one half percent of a facility owner's gross receipts, and the Department was required to conduct a review every twelve months as follows:

> Every twelve months on a schedule determined by [the Department], [the Department] will review each facility owner's quality assurance fee payments from all of the owner's facilities combined. A facility owner's liability for the quality assurance fee may be adjusted following this review to ensure that the quality assurance fee equals five and one half percent of annual gross receipts from all facilities.

*Id.* § 352.3(b) (effective Feb. 3, 2008). Following a review, the Department would notify the facility of the amount that was due if the facility owed additional amounts or refund an amount "[i]f the final audit findings show the facility [was] owed money due to overpayment of the quality assurance fee." *Id.* § 352.6(c)(4) (effective Feb. 3, 2008) (Enforcement).

**The Parties' Dispute**

The Providers contract with the Department to provide services to qualified individuals pursuant to respective Medicaid provider agreements,[5] and they are required to pay QAF.

---

[5] Among the terms in their respective agreements with the Department, appellants agreed to "[a]llow the Department to adjust payments made to [them], without notice, for prior overpayment or underpayment," and they agreed to "[c]omply with applicable state laws and rules" and

The Department also is under contract with the Centers for Medicare and Medicaid Services (CMS), which provides federal funding for the provision of services to qualified individuals. The parties' dispute concerns the Department's change in practice concerning amounts of underpaid QAF by a facility following six month reviews during the 2004–2007 time period. *See* 1 Tex. Admin. Code § 352.3(c); *see also* Tex. Health & Safety Code § 252.202(c). Prior to the 2008 amendments to the applicable rules, the Department did not seek to collect additional QAF to bring the total amount paid by the facility up to six percent of the facility's gross receipts following a six-month review but issued a refund to a facility if the six-month review showed that the facility had overpaid its QAF above the six-percent measure for that particular six-month period.

Following a financial management review of the State's QAF program, the CMS in 2009 determined that the Commission had not been performing a proper reconciliation process, resulting in facilities, including the Providers, underpaying their respective QAF for the 2004–2007 time period.[6] Specifically, the CMS determined that some facilities had not been paying amounts equal to six percent of gross receipts and that this practice violated the uniformity requirement in section 1903(w) of the Social Security Act. *See* 42 U.S.C. § 1396b(w) (requiring states to impose

"applicable federal laws and regulations." Although the Department relied on these provisions at the administrative level to support its position, the Department has not done so on appeal. We limit our analysis to the arguments raised by the parties. *See* Tex. R. App. P. 38.1(i), 38.2(a)(1).

[6] In the final report, the CMS explained how the Commission was not performing a proper reconciliation process:

> [The Commission] was submitting refunds for overpayments of QAF but not requiring underpayments to be paid to [the Department] upon reconciliation. Therefore, some of the facilities were delaying their submissions of Medicaid claims in order to lower their gross receipts for the six month reconciliation period and thus, pay a lower QAF amount.

health care related taxes uniformly). The CMS requested that the Commission recalculate the QAF that facilities owed to the State so that the total amount paid per facility equaled six percent of the particular facility's gross receipts for the 2004–2007 time period and then collect underpayments based on the recalculation. The CMS further warned the Commission that "[f]ailure to collect these underpayments may render the entire tax impermissible."

In response to the CMS's request, the Department recalculated the QAF owed per facility for the 2004–2007 time period and then sought to collect underpayments, including seeking collection from the Providers for underpayments as to their facilities from that time period. Disputing their liability for the underpayments, the Providers sought informal reviews and then administratively appealed the results of the informal reviews. For purposes of this appeal, the Providers' administrative records are substantively the same, except as to the amount that the Department sought to collect from each Provider. It is undisputed that the Providers made payments in accordance with the Department's instructions during the 2004–2007 time period but that they had underpaid their respective QAF below the six-percent measure based on the three-year recalculation. The Providers also did not present evidence to controvert the Department's evidence of their gross receipts and corresponding underpayments for the three year period. The Providers contended that they were not liable for the underpayments based on: (i) the Department's practice during the 2004–2007 time period not to collect underpayments following six-month reviews; (ii) their compliance with the Department's instructions during that time period as to the assessed QAF; and (iii) the applicable rules that, according to the Providers, did not authorize collection of underpayments.

7

The Providers' administrative appeals were denied by summary disposition. In their proposals for decision, the administrative law judges determined that the Commission had not followed its own rules when it failed to collect underpayments from the Providers during the 2004–2007 time period, that the Department had mischaracterized the QAF rules in effect during that time period, and that the Providers remained liable for underpayments. For example, in the proposal for decision as to appellant Southern Concepts, the ALJ's conclusions of law included:

- 1 Texas Administrative Code Section 352.3 in effect from September 1, 2004, through December 31, 2007, required ICF/MR providers to pay a QAF equal to 6% of reimbursements for residents, up to a total of 6% of annual gross revenues of the facility.

- [The Commission]'s failure to collect the full QAF that was payable under its rules did not excuse Appellant from its obligation to pay the full amount due it owed pursuant to those rules.

- Because there are no genuine issues of material fact regarding Appellant's total gross receipts during from [sic] September 1, 2004, through December 31, 2007, [the Department] is entitled to collect all underpayments of Appellant's QAF up to a total of 6% of said gross receipts.

In the analysis section, the ALJ explained that "the rules in effect during the period in question created an obligation on [the Provider] to pay a total of 6% of its gross receipts" and that the Providers' "obligation was not obviated by [the Commission]'s inability to devise a scheme to collect said receipts or [the Department]'s erroneous portrayal of the rule that created the obligation." The proposals for decision in the administrative appeals by the other Providers were substantively the same. The Department adopted the proposals for decision, reaffirmed the amounts of underpayment as to each Provider, and issued final orders that it was entitled to collect

8

underpayments as to each Provider "up to a total of six percent of said gross receipts" for the 2004–2007 time period.

The Providers thereafter filed a consolidated petition for judicial review. Facing competing motions for summary judgment, the trial court denied the Providers' motion for summary judgment, granted the Department's motion for summary judgment, and affirmed the Department's final orders. This appeal followed.

**Analysis**

The Providers raise two issues on appeal to support their position that the trial court's order granting the Department's summary judgment and affirming the Department's final orders should be reversed. They argue that the Department "is not now authorized to re-interpret the law to collect additional QAF taxes based upon the 2003 law that was settled and in effect during the relevant time period" and that the trial court "committed error by retroactively applying the law that came into effect in 2008, which was after the relevant time period for calculation of the additional QAF taxes at issue."

**Standards of Review**

The Providers' issues challenge the trial court's summary judgment in favor of the Department, which we review de novo. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). To prevail on a traditional summary judgment motion, the movant must demonstrate that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Knott*, 128 S.W.3d at 215–16. "When both parties move for summary judgment and the trial court grants one motion and denies the other, we review all the

summary judgment evidence, determine all issues presented, and render the judgment the trial court should have." *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013) (citing *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009)).

The Providers' issues also address matters of statutory and rule construction, questions of law that we review de novo. *See First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 631 (Tex. 2008); *Rodriguez v. Service Lloyds Ins. Co.*, 997 S.W.2d 248, 254 (Tex. 1999) (construing administrative rules in same manner as statutes because they have same force and effect). Our primary concern in construing a statute is the express statutory language. *See Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 867 (Tex. 2009). "We thus construe the text according to its plain and common meaning unless a contrary intention is apparent from the context or unless such a construction leads to absurd results." *Presidio Indep. Sch. Dist. v. Scott*, 309 S.W.3d 927, 930 (Tex. 2010) (citing *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625–26 (Tex. 2008)). We also "read the statute as a whole and interpret it to give effect to every part." *Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 628 (Tex. 2011) (quoting *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003)). Further, a precondition to deference to an agency's interpretation of a statute is ambiguity. *Southwest Royalties, Inc. v. Hegar*, 500 S.W.3d 400, 404–05 (Tex. 2016); *see Combs v. Roark Amusement & Vending, L.P.*, 422 S.W.3d 632, 635 (Tex. 2013) (describing agency-deference doctrine); *Combs v. Health Care Servs. Corp.*, 401 S.W.3d 623, 629–30 (Tex. 2013) (same).

This appeal also concerns judicial review of an agency's final orders, which is governed by section 2001.174 of the Texas Administrative Procedure Act (APA). This standard

requires that we reverse or remand a case for further proceedings "if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are (A) in violation of a constitutional or statutory provision; (B) in excess of the agency's statutory authority; (C) made through unlawful procedure; (D) affected by other error of law; (E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or (F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." Tex. Gov't Code § 2001.174(2). "This ground for reversal presents a question of law that we review de novo." *Public Util. Comm'n v. City Pub. Serv. Bd.*, 109 S.W.3d 130, 135 (Tex. App.—Austin 2003, no pet.); *see Texas Dep't of Pub. Safety v. Alford*, 209 S.W.3d 101, 103 (Tex. 2006) (explaining that appellate courts do not defer to trial court's judgment that agency order satisfies substantial-evidence standard). On appeal from the trial court's judgment, the focus of our review, as in the trial court, "is on the agency's decision." *Heritage on the San Gabriel Homeowners Ass'n v. Texas Comm'n on Envtl. Quality*, 393 S.W.3d 417, 424 (Tex. App.—Austin 2012, pet. denied) (citing *Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 562 (Tex. 2000)).

Relevant here, agency action may be found to be arbitrary and capricious when the agency fails to follow the clear, unambiguous language of its own regulations. *See Rodriguez*, 997 S.W.2d at 255; *Public Util. Comm'n v. Gulf States Utils. Co.*, 809 S.W.2d 201, 207 (Tex. 1991) ("[I]f the Commission has failed to follow the clear, unambiguous language of its own regulation, we must reverse its action as arbitrary and capricious." (citations omitted)); *see also Texas Health Facilities Comm'n v. Charter Med.-Dall., Inc.*, 665 S.W.2d 446, 454 (Tex. 1984) (providing

11

examples of agency actions that are arbitrary and capricious, such as "when a denial of due process has resulted in the prejudice of substantial rights of a litigant" and "when an agency improperly bases its decision on non-statutory criteria"); *Mont Belvieu Caverns, LLC v. Texas Comm'n on Envtl. Quality*, 382 S.W.3d 472, 485 (Tex. App.—Austin 2012, no pet.) (describing when "administrative agency is said to act arbitrarily and capriciously"); *Starr Cty. v. Starr Indus. Servs., Inc.*, 584 S.W.2d 352, 356 (Tex. App.—Austin 1979, writ ref'd n.r.e.) ("The major factor that runs throughout arbitrary-capricious review cases is that parties must be able to know what is expected of them in the administrative process.").

Further we review an agency's "legal conclusions for errors of law." *CPS Energy v. Public Util. Comm'n*, 537 S.W.3d 157, 169 (Tex. App.—Austin 2017, pet. filed) (citing *Heat Energy Advanced Tech., Inc. v. West Dall. Coal. for Envtl. Justice*, 962 S.W.2d 288, 294–95 (Tex. App.—Austin 1998, pet. denied)); *see Riley v. Texas State Bd. of Exam'rs of Prof'l Counselors*, 315 S.W.3d 135, 137 (Tex. App.—Austin 2010, pet. denied) ("An administrative decision is subject to reversal if it is affected by error of law."); *see also Texas Dep't of Pub. Safety v. Story*, 115 S.W.3d 588, 594 (Tex. App.—Waco 2003, no pet.) (explaining that section 2001.174(2)(D) is "a catchall ground for reversal or remand to provide remedy for one who has suffered an adverse administrative determination 'affected' by some legal error other than those described in the other subcategories").

With these standards in mind, we turn to the Providers' first issue.

**Underpayments for 2004–2007 Time Period**

In their first issue, the Providers argue that the trial court improperly interpreted the law or committed error regarding the applicable law because the Department "is not now authorized to re-interpret the law to collect additional QAF taxes based upon the 2003 law that was settled and in effect during the relevant time period" and that the final agency orders should be reversed under section 2001.174 of the APA because they were unreasonable, plainly erroneous, arbitrary, capricious, in excess of the agency's statutory authority, and characterized by abuse of discretion or clearly unwarranted exercise of discretion. *See* Tex. Gov't Code § 2001.174(2). The Providers argue that: (i) an "adjustment was only allowed at the 6-month interval mandated by the Rule"; (ii) the Department may not "re-adjust the QAF at another time according to [the Department]'s whim"; and (iii) it is "patently unfair" for the Department to have construed and applied the rules one way during the relevant time period and to then re-interpret the rules "because it was called out on its deliberate and knowing practice of non-uniform taxation by [the] CMS."

As support for its position that the Providers are liable for underpayments during the 2004–2007 time period, the Department focuses on its mandate to collect QAF, *see* Tex. Health & Safety Code § 252.204(a) (stating that Commission or Department at Commission's direction "shall collect the quality assurance fee"); *see also* Tex. Gov't Code § 311.016(2) ("'Shall' imposes a duty."), and the executive commissioner's prohibition from adopting rules "granting any exceptions from the quality assurance fee," *see* Tex. Health & Safety Code § 252.205(b) ("The executive commissioner may not adopt rules granting any exceptions from the quality assurance fee."); 1 Tex. Admin. Code § 352.6(b) (providing that the Department "may not grant any exceptions

13

from the quality assurance fee"); *see also* Tex. Gov't Code § 311.016(5) ("'May not' imposes a prohibition and is synonymous with 'shall not.'").

The Department's position prior to the 2008 amendments to its rules, however, was that its rules' language was too vague to enforce collection of underpayments following the six-month reviews. Consistent with the plain language of its rules, the Department interpreted its rules to refund overpayments to facilities following six-month reviews without factoring underpayments in a particular month into the calculation. *See* 1 Tex. Admin. Code § 352.3(b)–(c) (providing that QAF owed by a facility was "in the amount of six percent of each reimbursement or payment rate received, including those received from the resident, for each resident in the facility during the calendar month" and that "[a] facility's liabilities for the quality assurance fee may be adjusted following [the six-month] review to ensure that the quality assurance fee does not exceed six percent of annual revenue"); *Scott*, 309 S.W.3d at 930; *cf.* 1 Tex. Admin. Code §§ 352.3(b) (effective Feb. 3, 2008) (allowing adjustment following twelve-month review "to ensure that quality assurance fee equals five and one half percent of annual gross receipts from all facilities"), 352.6(c)(4) (effective Feb. 3, 2008) (requiring Department to notify facility if final audit shows facility owes additional amounts of QAF). And, without "granting any exceptions" to a particular facility, it is undisputed that the Department uniformly applied its interpretation when it calculated and reviewed QAF owed per facility during the 2004–2007 time period. *See* 1 Tex. Admin. Code § 352.6(b).

The Department also does not dispute that the Providers paid their respective QAF on a monthly basis in accordance with the Department's contemporaneous instructions and practices

14

during the 2004–2007 time period.  The Department's practice under the regulatory scheme was to

calculate the monthly assessed QAF based on the cash that the particular facility actually received

in that month.[7]  *See* 1 Tex. Admin. Code §§ 352.2(2) (defining "gross receipts" to mean "money paid

to a facility as compensation for services provided to patients, including client participation"),

352.5(1) (requiring facility to pay QAF in accordance with Department's instructions "not later than

the 30th day after the last day of the month for which the fee is assessed"); *cf.* 1 Tex. Admin. Code

§ 352.2(3) (effective Feb. 3, 2008) (defining "gross receipts" to mean "money paid to a facility as

compensation for services provided to residents, including resident participation" and "as accrued

payments and not as cash received").

   In contrast to the Department's contemporaneous interpretation of the applicable

statutes and rules and its practices under the regulatory scheme for assessing QAF owed per facility

during the 2004–2007 time period, the Department's current interpretation does not find support in

the express language of its rules or the corresponding statutes.  *See Scott*, 309 S.W.3d at 930; *see*

*also Southwest Royalties*, 500 S.W.3d at 405 ("[D]eferring to an agency's construction is appropriate

only when the statutory language is ambiguous."); *State v. Public Util. Comm'n*, 883 S.W.2d 190,

196 (Tex. 1994) ("[T]he contemporaneous construction of a statute by the administrative agency

charged with its enforcement is entitled to great weight.").

---

  [7] As explained by the Providers and not disputed by the Department, the Department's established practice defined QAF "to be calculated and assessed on a *cash* basis as 6% of the gross receipts *actually received* by appellant from [the Department] in a particular *month*, reconciled every *six months* to refund *overpayments*" of QAF without factoring underpayments in a particular month into the calculation, but the Department changed its practice by seeking additional amounts of QAF from the Providers "calculated and assessed on an *accrual* basis as 6% of revenue *accrued* in a particular *month*, reconciled *years later* to recoup *underpayments*."  (Emphasis in original).

15

The regulatory scheme during the 2004–2007 time period did not contemplate or provide for a three-year, after-the-fact recalculation of QAF owed per facility or a procedure for the Department to collect additional QAF based on the recalculation. *See Texas Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 452 (Tex. 2012) (explaining that court "presumes the Legislature deliberately and purposefully selects words and phrases it enacts, as well as deliberately and purposefully omits words and phrases it does not enact"). The rules specifically set out the procedures for the facilities' monthly reporting requirements, the Department's assessment and collection of monthly payments from the facilities, and the six-month review by the Department, but the rules are silent as to an after-the-fact recalculation and subsequent assessment and collection of additional QAF by the Department years later based on the recalculation. *See* 1 Tex. Admin. Code §§ 352.3–.5; *Ruttiger*, 381 S.W.3d at 452; *see also City of Marshall v. City of Uncertain*, 206 S.W.3d 97, 105 (Tex. 2006) (stating that courts "presume that every word of a statute has been included or excluded for a reason" (quoting *Old Am. Cty. Mut. Fire Ins. Co. v. Sanchez*, 149 S.W.3d 111, 115 (Tex. 2004))); *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex. 1981) ("Only when it is necessary to give effect to the clear legislative intent can we insert additional words or requirements into a statutory provision."). Further, pursuant to the express statutory directives, facilities are required to file reports and to make payments on a monthly basis, and the Department is only expressly authorized to subject a QAF "to a prospective adjustment as necessary"—the statute does not address or authorize "retrospective adjustment." *See* Tex. Health & Safety Code §§ 252.202(b) (stating that "fee is subject to a prospective adjustment as necessary"), .204 (addressing reporting and collection); *Ruttiger*, 381 S.W.3d at 452.

16

Based on our interpretation of the plain language of the applicable rules and statutes—as they existed during the 2004–2007 time period—we conclude that the Department failed to follow its own rules in implementing the after-the-fact recalculations and assessments of QAF owed per facility and that, by doing so, it prejudiced the substantial rights of the Providers. *See* Tex. Gov't Code § 2001.174(2)(F); *Rodriguez*, 997 S.W.2d at 255; *see also Starr Cty.*, 584 S.W.2d at 356 (explaining that parties "must be able to know what is expected of them in the administrative process").

We also conclude that the Department's final orders are based on errors of law that prejudiced the substantial rights of the Providers. *See* Tex. Gov't Code § 2001.174(2)(D). In the proposals for decision that were adopted by the Department, the ALJs stated that: (i) the 2003 version of section 352.3 "required . . . providers to pay a QAF equal to 6% of the facility's total annual gross receipts in Texas"; (ii) "the rules in effect during the period in question created an obligation on [each Provider] to pay a total of 6% of its gross receipts"; and (iii) the Provider's "obligation was not obviated by [the Commission]'s inability to devise a scheme to collect said receipts or [the Department]'s erroneous portrayal of the rule that created the obligation." The applicable rule, however, references "six percent" in the context of the required calculation and assessment that is made "during a calender month" with the restriction that "the amount of all such quality assurance fees assessed for the facility during the 12-month period following assessment of the quality assurance fee do not exceed six percent of the facility's total annual gross receipts in Texas." 1 Tex. Admin. Code § 352.3(b). Instead of a flat "six percent" annual fee as interpreted by

17

the Department, "six percent" operates to set the maximum allowable QAF that may be assessed against a facility.

Similar to this limitation in the rules, the statute refers to "six percent of the facility's total annual gross receipts" as the maximum amount of QAF that the Department may assess against a facility. *See* Tex. Health & Safety Code § 252.202(b). Thus, the plain language of the rules and corresponding statute directly conflicts with the Department's legal conclusions that a facility's QAF during the 2004–2007 time period was equal to a "six-percent" fee and that each Provider was obligated "to pay a total of 6% of its gross receipts." *Cf.* 1 Tex. Admin. Code § 352.3 (effective Feb. 3, 2008) (stating that QAF for facility "is five and one half percent of a facility owner's gross receipts" and that QAF may be adjusted following 12-month review "to ensure that [QAF] *equals* five and one half percent of annual gross receipts from all facilities" (emphasis added)).

On these bases, we conclude that the Department's final orders adopting the proposals for decision and affirming the Providers' liability for underpayments for the 2004–2007 time period were arbitrary and capricious and affected by errors of law that prejudiced the substantial rights of the Providers. *See* Tex. Gov't Code § 2001.174(2)(D), (F); *Rodriguez*, 997 S.W.2d at 255; *Riley*, 315 S.W.3d at 137. We sustain the Providers' first issue.[8]

---

[8] Because we have sustained the Providers' first issue, which is dispositive of this appeal, we do not address their second issue in which they contend that the trial court erred by retroactively applying the 2008 amendments to the rules. *See* Tex. R. App. P. 47.1. In any case, we do not defer to the trial court's judgment in our analysis under section 2001.174. *See Heritage on the San Gabriel Homeowners Ass'n v. Texas Comm'n on Envtl. Quality*, 393 S.W.3d 417, 424 (Tex. App.—Austin 2012, pet. denied) (citing *Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 562 (Tex. 2000)) (explaining that focus of appellate review is "on the agency's decision" and that appellate court does not defer to trial court's judgment that agency order satisfies substantial-evidence standard under section 2001.174).

18

## Conclusion

For these reasons, we reverse the trial court's order and the Department's final orders and remand the administrative cases to the Department for further proceedings.

_____

Melissa Goodwin, Justice

Before Justices Puryear, Goodwin, and Field

Reversed and Remanded

Filed:   November 7, 2018